# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
March 23, 2017

Plaintiff-Appellee,

v

No. 328173
Macomb Circuit Court
LC No. 2014-002444-FC

CLINTON RAYSHAWN GRAYSON,

Defendant-Appellant.

Before: SERVITTO, P.J., and STEPHENS and RONAYNE KRAUSE, JJ.

PER CURIAM.

Defendant appeals as of right his jury convictions of first-degree felony murder, MCL 750.316(1)(b), armed robbery, MCL 750.529, possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, and conspiracy to commit armed robbery, MCL 750.157a; MCL 750.529. The trial court sentenced defendant to life imprisonment without parole for the first-degree murder conviction, to be served consecutive to a two-year term of imprisonment for the felony-firearm conviction, and concurrent prison terms of 23 years 9 months to 50 years each for the armed robbery and conspiracy to commit armed robbery convictions. We affirm.

Defendant's convictions arise from a robbery and shooting at the Moon Lite Party Store in Clinton Township on March 28, 2014. The owner of the store, Basim Sulaka, was shot and killed during the robbery. Defendant and three other codefendants, Kenneth Hill, Darius Diaz-Gaskin, and Jomar Robinson, were charged in the offense. Defendant's trial was severed from the trials of the other three codefendants by stipulation.[1]

## I. IDENTIFICATION TESTIMONY

While this is not the first issue raised by defendant, we approach the officer's identification issue first because it is based upon this issue that we decline to reverse later in this

---

[1] After defendant was convicted, codefendants Hill, Robinson, and Diaz-Gaskin were tried jointly. All three codefendants were convicted of first-degree felony murder, armed robbery, conspiracy to commit armed robbery, and felony-firearm. Their appeals are pending in Docket Nos. 329166 (Hill's appeal), 329209 (Robinson's appeal), and 329223 (Diaz-Gaskin's appeal).

-1-

opinion for the trial court's error in denying defendant's motion to suppress. Defendant contends that he was denied a fair trial because the police officers invaded the province of the jury by opining that one of the men in the store's surveillance videos was defendant. We disagree. Defendant failed to preserve his challenge to the officers' testimony by objecting to the testimony at trial. *People v Osby*, 291 Mich App 412, 414; 804 NW2d 903 (2011). "In order to avoid forfeiting an unpreserved error, a defendant has the burden of establishing that the '(1) error occurred, (2) the error was plain, i.e. clear or obvious, and (3) the plain error affected substantial rights.' " *Id*. (citation omitted).

Inspector Joseph Burns and Detective Quinn both testified that they were able to identify suspect one in the surveillance video as defendant.[2] Although Burns testified that he had experience identifying individuals as a police officer, and Quinn testified that he had training in facial recognition, neither was qualified to testify as an expert in that field. Thus, their testimony constituted lay opinion testimony under MRE 701. *People v Fomby*, 300 Mich App 46, 50; 831 NW2d 887 (2013).

MRE 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

"[A] witness cannot express an opinion on the defendant's guilt or innocence of the charged offense." *Fomby*, 300 Mich App at 53 (citation and quotation marks omitted). "[T]he issue of whether the defendant in the courtroom was the person pictured in a surveillance photo [is] a determination properly left to the jury." *Id*. at 52 (citations and quotation marks omitted). "[W]here a jury is as capable as anyone else of reaching a conclusion on certain facts, it is error to permit a witness to give his own opinion or interpretation of the facts because it invades the province of the jury." *People v Perkins*, 314 Mich App 140, 161-162; 885 NW2d 900 (2016) (citation and quotation marks omitted) vacated in part by *People v Perkins*, unpublished order of the Court of Appeals, entered February 12, 2016 (Docket Nos. 323454, 323876, 325741), and superseded in part on other grounds by *People v Hyatt*, ___ Mich App ___; ___ NW2d ___ (2016) (Docket No. 325741).

In *Fomby*, 300 Mich App at 48, an officer was permitted to testify regarding the identity of individuals in still photos and surveillance footage. This Court concluded that the officer's testimony helped the jury to correctly and efficiently determine whether the individuals seen in the footage were the same individuals involved in the murder later depicted in the video because the video was long, likely depicted other individuals, and it could be inferred that the officer viewed the video and photographs several times. *Id*. at 52. The Court noted that the "common thread" of authority allowed the admission of such testimony where there was "reason to believe that the witness is more likely to identify correctly the person than is the jury." *Id*. (citation and

---

[2] It appears that the officers identified defendant as suspect one in both the video from the party store and the video from the apartment complex.

quotation marks omitted). This Court concluded that the officer did not invade the province of the jury because he only linked individuals in the video as being the same individuals depicted in the still photographs. *Id*. at 53.

In *Perkins*, 314 Mich App at 160, the witness identified the defendant in video and still frame photographs from the stairwell of the apartment building where a murder occurred. This Court concluded that the witness should not have been allowed to identify the defendant as the individual where "[t]here was nothing about the images (i.e., poor quality of the images, defendant wearing a disguise) that necessitated [his] opinion." *Id*. at 162. This Court concluded however, that even if the trial court abused its discretion, the error was not outcome determinative because the evidence was overwhelming and the defendant's identity was not in dispute. *Id*.

In *United States v LaPierre*, 998 F2d 1460, 1465 (CA 9, 1993), amended August 19, 1993, the court explained that such lay opinion testimony has been limited to two types. "The first type is those in which the witness has had substantial and sustained contact with the person in the photograph." *Id*. "The second type is those in which the defendant's appearance in the photograph is different from his appearance before the jury and the witness is familiar with the defendant as he appears in the photograph." *Id*. The court stated: "We can perhaps imagine a hypothetical scenario in which a witness who knew a defendant only through photographs nonetheless had become sufficiently familiar with his appearance to give lay opinion testimony of this sort." *Id*.

This case is similar to *Perkins* because both officers identified defendant as suspect one in the surveillance videos. Unlike in *Fomby*, they did not merely link individuals in a video and photographs as being the same individuals. The officers' testimony was based on their perceptions of the video. See *Fomby*, 300 Mich App at 50-51. The question is whether the testimony was helpful to the determination of a fact in issue and whether it invaded the province of the jury. See *id*. at 51-52. Given that defendant was wearing a mask in the video from the party store, the officers' testimony was helpful to the jury in identifying him. See *Perkins*, 314 Mich App at 162. Similarly, given that defendant's face was not clearly visible in the video from the apartment complex, the officers' testimony was helpful in identifying him.[3] See *id*. The officers had become familiar with defendant through photographs, and they recognized characteristics of defendant in the videos, such as his hair, the shape of his nose, the shape of his eyes, his skin tone, and his build. Burns testified that he had viewed the video of the party store 40 or 50 times. Therefore, the officers were in a better position than the jury to identify defendant in the videos. Accordingly, the admission of the officers' testimony did not constitute plain error.

## II. MOTION TO SUPPRESS

---

[3] The quality of the video from the apartment complex was apparently poor. At one point, the prosecutor asked Lant, "Now that's a dark camera, can you identify anyone in that photo?" The prosecutor also asked, "Sir, the footage of the exit and entrance of Mr. Hill's apartment is a little grainy and dark, but you said you recognized the one individual with the bigger, the more hair? Lant also testified that he could not see the face of "the guy with the hair."

Defendant also argues that the trial court erred by denying his motion to suppress his statement to the police. Defendant contends that the police improperly questioned him after he invoked his right to an attorney and his right to remain silent. The trial court found that while the defendant invoked his rights to silence and to an attorney he voluntarily waived those rights when he reinitiated questioning before any further interrogation or express questioning by the police. Although we conclude that the trial court erred by denying defendant's motion to suppress, we also conclude that the error was harmless.

The relevant facts in this case are undisputed. Therefore, the "trial court's decision regarding whether [a] defendant was subjected to 'interrogation' or, more specifically, 'express questioning or its functional equivalent,' " is reviewed de novo. *People v White*, 493 Mich 187, 193; 828 NW2d 329 (2013). In *People v Henry (After Remand)*, 305 Mich App 127, 145; 854 NW2d 114 (2014), this Court explained:

> A criminal defendant enjoys safeguards against involuntary self-incrimination during custodial interrogations. Included within these safeguards is the right to remain silent during custodial interrogation and the right to cut off police questioning. A defendant may assert his or her right to remain silent at any time, however, the assertion must be unequivocal. When a defendant invokes his or her right to remain silent, the police must "scrupulously honor" the defendant's request. The police fail to "scrupulously honor" a defendant's invocation of the Fifth Amendment right "by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind."
>
> > If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. [Citations omitted.]

"If the police continue to 'interrogate' the defendant after he has invoked his right to remain silent, and the defendant confesses as a result of that 'interrogation,' the confession is inadmissible." *White*, 493 Mich at 194 (citation omitted).

In *White*, 493 Mich at 195-196, our Supreme Court stated:

> In [*Rhode Island v Innis*, 446 US 291, 300-302; 100 S Ct 1682; 64 L Ed 2d 297 (1966),] the United States Supreme Court explained the circumstances under which a defendant is deemed to have been subjected to "interrogation":

[T]he *Miranda*[4] safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response. [Emphasis in the original.]

The Court further explained that the underlying intent of the police is not relevant:

[I]t may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect. [*Id.* at 301 n 7.]

But, as one academic commentator explained, the focus must be on the objective manifestation of the officer's words rather than on the officer's subjective intentions in speaking the words:

[T]he best reading of the *Innis* test is that it turns upon the *objective* purpose *manifested* by the police. Thus, an officer "should know" that his speech or conduct will be "reasonably likely to elicit an incriminating response" when he should realize that the speech or conduct will probably be viewed by the suspect as designed to achieve this purpose. To ensure that the inquiry is entirely *objective,* the proposed test could be framed as follows: if an objective observer (with the same knowledge of the suspect as

---

[4] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

the police officer) would, on the sole basis of hearing the officer's remarks, infer that the remarks were designed to elicit an incriminating response, then the remarks should constitute "interrogation." [2 LaFave, Criminal Procedure (3d ed.), § 6.7(a), p. 757, quoting White, *Interrogation Without Questions: Rhode Island v Innis and United States v Henry,* 78 Mich L R 1209, 1231-1232 (1980) (emphasis in the original).]

In this case, it is undisputed that defendant unequivocally asserted his right to remain silent when he stated, "I don't want to talk no more."[5] The question is whether the police "scrupulously honor[ed]" defendant's request by ceasing the interrogation. *Henry*, 305 Mich App at 145.

In *White*, 493 Mich at 191, after the defendant said he did not want to speak, the officer stated, "I hope that the gun is in a place where nobody can get a hold of it and nobody else can get hurt by it." The Court concluded that this statement did not constitute interrogation or the functional equivalent of express questioning. *Id*. at 198-209. When the Court concluded that the defendant was not the subject of express questioning, it also made several findings: (1) the officers comment regarding the gun was not a question because it did not ask for an answer or invite a response; (2) the addition of the words "okay" and "all right" at the end of the comment did not transform it into a question; (3) the officer told the defendant that he was not asking him questions; (4) the defendant's "response" to the comment concerning the location of the gun did not have anything to do with the location of the gun; (5) the officer seemed surprised by the defendant's incriminating statement and immediately tried to veer the conversation away from any further incriminating statements; and (6) to the extent the officer's statement could be viewed as a question, it did not seem intended to generate an incriminating response. *Id*. at 198-202. In concluding that the defendant was also not subjected to the functional equivalent of express questioning, the Court determined that: (1) there was nothing to suggest that the officer was aware that the defendant was peculiarly susceptible to an appeal to his conscience; (2) there was nothing to suggest that the officer was aware that the defendant was unusually disoriented; (3) the officer made only a single remark about the gun and did not carry on a "lengthy harangue"; and (4) the comment was not particularly evocative. *Id*. at 202-204. The Court also concluded that the fact that the officer was talking directly to the defendant was not determinative. *Id*. at 205-207.

---

[5] Although the prosecutor disputes whether defendant also asserted his right to counsel, this issue is not determinative since defendant clearly invoked his right to remain silent. A suspect who invokes his right to counsel may not be subjected to further interrogation until counsel is made available, unless the suspect initiates further communication with the police. *People v Crusoe*, 433 Mich 666, 684; 449 NW2d 641 (1989). Thus, if defendant invoked his right to counsel, the question would similarly be whether he initiated further communication with the police (i.e., whether any further communication was not the result of continued interrogation or express questioning by the police).

It is instructive to review the exchange in this case that followed defendant's express request that he only be interrogated with a lawyer present:

*DETECTIVE [DAN] QUINN.* You don't want to talk any more? You just going to go with their story and not --

You don't want to give your explanation for what.

*DEFENDANT GRAYSON.* I don't know what the three is, what they are saying.

*DETECTIVE [BRYAN] GILBERT.* That is the truth, but that is fine.

*DEFENDANT GRAYSON.* I understand.

*DETECTIVE GILBERT.* We just have a rapport, give everybody the opportunity. This is your chance.

*DETECTIVE QUINN.* I'm not, I certainly don't want to come across and I am not trying to be mean to you or being a jerk or anything.

*DEFENDANT GRAYSON.* I understand.

*DETECTIVE QUINN.* This is just, like, we said, your opportunity to tell us your portion because everybody is going to be charged with felony murder. Okay. Including yourself. Okay.

But the way I look at it is that within those charges the Judge is going to look at things, and don't misinterpret this as any promises, you know, any projection of what happened.

But the way things are going to be looked at is within the felony murder, right, each person had a different level of involvement, okay.

You have got Ken who had some involvement. Jomar had some involvement. You know, yourself had some involvement and you got Darius, right?

I don't want you to miss the opportunity to tell us what you did, only what you did, and to get everything lumped in together. You know what I mean?

So when it comes down for sentencing, right, they're going to look at it as not only did Darius say this, he also even wrote a letter to apologize to the family. Okay.

It's not a matter of what happened, it's why it happened. So this is your chance to explain a little bit about how it all took place.

*DEFENDANT GRAYSON.* Uhm, I'm confused you just told me I had the other gun.

At this point, Detective Gilbert said, "I am sorry," and defendant repeated his comment, stating, "You told me I had the other gun. I don't know who said I had the other gun." Detective Quinn then stated, "We got the tapes of you with the other gun." The detectives then presented defendant with inculpatory evidence and expressly questioned defendant about what happened, which resulted in defendant making incriminating statements admitting his involvement in the offense.

We agree that, similar to *White*, defendant was not subjected to express questioning. Although the detectives used the words "okay" and "right" at the end of their statements, this did not transform them into questions. See *White*, 493 Mich at 198-199. Nonetheless, we conclude that defendant was subjected to the functional equivalent of express questioning. Unlike in *White*, the detectives did not tell defendant that they were not asking him questions. Their statements, in which they repeatedly told defendant that it was his opportunity to talk and tell what he did, and that it could affect his sentencing, were the functional equivalent of express questioning intended to elicit an incriminating response. Plaintiff argues that defendant's response, regarding the gun, was not related to the detectives' statements. Although the detectives did not mention the gun after defendant asserted his right to remain silent, their comments attempted to get defendant to talk about his involvement in the crime and tell what he did. Thus, defendant's reference to his possession of the gun was not completely unrelated to their statements. Furthermore, unlike in *White*, the detectives were not surprised when defendant made the statement, and they continued to invite further incriminating responses. After defendant's statement about the gun, Detective Gilbert said, "I am sorry," and defendant repeated his comment, stating, "You told me I had the other gun. I don't know who said I had the other gun." Detective Quinn then stated, "We got the tapes of you with the other gun." The officers did not try to veer the conversation away from further incriminating statements. *White*, 493 Mich at 200-201.

Although there was nothing to suggest that the detectives knew that defendant had any particular susceptibility or was disoriented, that is not dispositive in this case. Unlike in *White*, the detectives did not make a single statement. Rather, their comments were more akin to a "lengthy harangue," *White*, 493 Mich at 204 (citation and quotation marks omitted), in which they repeatedly told defendant that this was his opportunity to talk. The detectives' comments, in particular those related to sentencing, were also particularly evocative. As defendant argues, Detective Quinn lied about the fact that defendant's statements might help at sentencing, and deception is designed to elicit an incriminating response.[6] Thus, the detectives should have known that their comments were reasonably likely to have that effect.

---

[6] Specifically, the detectives suggested that defendant could be treated differently at sentencing based on his level of involvement and the statements he made. However, defendant was facing a charge of first-degree felony murder, which is subject to a mandatory penalty of life imprisonment without parole. MCL 750.316(1)(b).

-8-

In *White*, 493 Mich at 207, the Court explained that "courts have generally rejected claims . . . that disclosure of the results of a lineup or other inculpatory evidence possessed by the police, without more, constitutes 'interrogation' under *Innis*." (Citation omitted). In this case, however, the detectives did not merely disclose inculpatory evidence to defendant. Rather, they disclosed such evidence while repeatedly telling defendant that it was his chance to talk, and they provided him with misleading information about the benefits of talking. Immediately after the detectives talked about sentencing, defendant began talking again.

In sum, we conclude that the detectives' statements constituted interrogation. As the Court in *White* stated, "the dispositive question is whether the suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." *White*, 493 Mich at 208 (citation and quotation marks omitted). The detectives should have known that, by repeatedly telling defendant that this was his opportunity to talk and tell what he did, defendant would make an incriminating statement.[7]

Having concluded that the trial court erred by admitting defendant's statement, the question is whether, given the untainted evidence in this case, the admission of the statement was harmless beyond a reasonable doubt. *Henry*, 305 Mich App at 148. In *People v Dendel*, 289 Mich App 445, 475-476; 797 NW2d 645 (2010), this Court observed:

> A constitutional error is harmless if [it is] clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error. In other words, if it is beyond a reasonable doubt that the jury would have convicted defendant on the basis of untainted evidence, defendant is not entitled to a new trial. [Citations and quotation marks omitted.]

The prosecution is required to prove "beyond a reasonable doubt that there is no reasonable possibility that the evidence complained of might have contributed to the conviction." *People v Anderson (After Remand)*, 446 Mich 392, 406; 521 NW2d 538 (1994) (citation omitted). In determining whether an error was harmless, this Court often considers whether the evidence establishing the defendant's guilt was overwhelming. See *People v McDonald*, 303 Mich App 424, 440; 844 NW2d 168 (2013).

In this case, there was sufficient evidence to find defendant guilty beyond a reasonable doubt, even without his statement to police. A witness who lives a short distance from the party store testified that on the night of the incident, he was smoking a cigarette outside his home around 11:05 p.m. when he saw a boxy, tan-colored vehicle with tinted windows and a loud exhaust or engine stop on his street, Elmira. The vehicle pulled over in front of a nursing building and three people, all dressed in dark clothing got out of the vehicle and began walking.

---

[7] Although defendant's statement about the gun was not itself incriminating, that statement led to the officers presenting defendant with inculpatory evidence, the officers expressly questioning defendant about what happened, and defendant making incriminating statements. The officers essentially "[wore] down his resistance and [made] him change his mind." *Henry*, 305 Mich App at 145 (citation and quotation marks omitted).

-9-

When the witness left for work a short time later, he saw a lot of police cars at the party store and thought that their appearance may be related to the single car and the three people he had seen on his street just a short time earlier, so he advised the police what he had seen. Another witness testified that he was driving by the party store on the night of the incident when he saw three individuals dressed in dark clothing and wearing dark ski masks, one of whom was carrying a red duffle bag, running out of the party store. A police canine unit tracked a scent from the party store to Elmira Street and officers testified that they found money on the ground in front of the nursing building on Elmira after the robbery.

Video surveillance taken at the party store recorded the robbery and shooting, with time stamps, showing that the robbery began at approximately 11:04 p.m. and concluding at approximately 11:06 p.m. This video was played for the jury. However, after reviewing the footage, police did not have the names of any of the three suspects shown in the video. Information was released to the public in an effort to solve the crime. A number of different tips were received and a lot of individuals were looked at as part of the investigation. Having received defendant's name (as well as his co-defendants) as a possible suspect, police then looked up his Facebook page to review photos of defendant and were also able to see him and his association with his co-defendants. Police also obtained defendant's driver's license photograph.

A security supervisor in charge of the security cameras at the Lotus Apartment complex in Clinton Township testified that he was familiar with a tenant of one of the apartments, defendant's co-defendant, Kenneth Hill. He testified that Hill drove a tan or gold Buick LeSabre with tinted windows that had a loud exhaust. The security supervisor further testified that security footage from the day of the party store incident shows four individuals leaving the area of Hill's apartment at 10:36 p.m. The video at 10:39 p.m. shows that the car in no longer in the parking lot. At 11:16 p.m., Hill's vehicle is seen returning to the apartment and, a few minutes later, the same four individuals are seen walking up the stairway toward Hill's apartment. The security supervisor recognized Hill from the video footage as well as one of the other men "with the hair" as having been around before, although he could see neither's face clearly. The video footage was shown to the jury.

One of the officers testified that he saw the video footage and still shots from the party store surveillance, the video from the apartment complex security camera, and he had also seen the Facebook photos from defendant's Facebook page. He testified that in the party store footage and still shots, the subject had a substantial amount of hair underneath his hat, a medium complexion, a wide, distinct bridge of his nose, and a build that was not heavy. The officer testified that the same characteristics were notable in the apartment complex security video and in defendant's Facebook photos, and that they were able to identify defendant as one of the suspects based on these characteristics. Another officer testified that defendant had specific characteristics that made him recognizable as well, including his hair, his nose, and a dark discoloration under his eyes.

One of the officers investigated the cell phone records of defendant. His investigation revealed an increased pattern of interaction between defendant and his co-defendants both before and after the party store incident. And, records showed that defendant's phone was in the area of the party store at the time of the incident.

When defendant was arrested at the home of a friend, the friend identified belongings of defendant's that were in her home. Those items included an open duffle bag containing black clothing and a black knit ski mask.

Looking at the totality of the evidence, and placing special emphasis on the fact that the jury was provided with all of the video footage, photographs, and still images, the jury was free to make its own determination as to whether defendant was, beyond a reasonable doubt, one of the perpetrators of the crimes at issue, even without his statements to police. The evidence provided was sufficient to allow them to make this determination in the affirmative.

## III. JURY INSTRUCTIONS

Next, defendant argues that he was denied a fair trial because the trial court erroneously denied his request for a jury instruction on the defense of accident. We disagree.

"[J]ury instructions that involve questions of law are . . . reviewed de novo. But a trial court's determination whether a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion."

> Challenges to jury instructions are considered in their entirety to determine whether the trial court committed error requiring reversal. Jury instructions must clearly present the case and the applicable law to the jury. The instructions must include all elements of the charged offenses and any material issues, defenses, and theories *if supported by the evidence*. Therefore, when a jury instruction is requested on any theories or defenses and is supported by evidence, it must be given to the jury by the trial judge. However, a trial court is not required to give a requested instruction where the theory is not supported by evidence. Even when a defendant has been charged with first-degree murder and claims a firearm accidentally discharged, failure to instruct on accident is not subject to automatic reversal but is subject to review for harmless error. In the event of an instructional error, a defendant must demonstrate that it is more probable than not that the failure to give the requested lesser included misdemeanor instruction undermined reliability in the verdict. [*Perkins*, 314 Mich App at 163-164 (citations and quotation marks omitted).]

Defendant contends that the trial court should have provided M Crim JI 7.1 because the discharge of codefendant Darius Diaz-Gaskin's gun was accidental. M Crim JI 7.1 is titled "Murder: Defense of Accident (Involuntary Act)" and provides:

> (1) The defendant says that [he / she] is not guilty of _____ because _____'s death was accidental. That is, the defendant says that _____ died because [*describe outside force; e.g., "the gun went off as it hit the wall"*].

> (2) If the defendant did not mean to [pull the trigger / (*state other action*)] then [he / she] is not guilty of murder. The prosecutor must prove beyond a reasonable doubt that the defendant meant to _____.

The "*Use Note*" provides: "This instruction is designed for use where the defendant alleges that the act itself was entirely accidental. It is meant to be used as a defense to a murder charge only."

In this case, Detective Quinn testified that defendant claimed in his statement to the police that the shooting was an accident. However, defendant maintained that it was Diaz-Gaskin, not defendant, who fired the gun. As plaintiff argues, defendant could not know Diaz-Gaskin's intent, and the circumstances of the shooting, including that the defendants entered the store with loaded weapons and that the victim was shot from behind, do not suggest an accident. Moreover, although defendant claimed that the shooting was an accident, he did not allege any involuntary act or outside force that occurred, such as the gun going off as it hit a wall, which would have supported an accident instruction. Contrary to defendant's assertion, he did not say that Diaz-Gaskin and the victim struggled. Thus, despite defendant's claim that the shooting was accidental, M Crim JI 7.1 was not supported by the evidence. See *Perkins*, 314 Mich App at 163.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends that he was denied the effective assistance of counsel by his trial attorney's failure to object to the officers' identification testimony. Because we determine that the officer's testimony was admissible, we disagree.

Defendant failed to preserve his claim of ineffective assistance of counsel by moving for a *Ginther*[8] hearing or a new trial in the trial court. *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009). Because no *Ginther* hearing was held, this Court's review is limited to mistakes apparent on the record. *Id*. To establish a claim of ineffective assistance of counsel,

> [a] defendant must first show that defense counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the defense. Whether defense counsel's performance was deficient is measured against an objective standard of reasonableness. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. [*Payne*, 285 Mich App at 188-189 (citations and quotation marks omitted).]

For the reasons discussed in section III, *supra*, the admission of the officers' testimony did not constitute plain error. "Trial counsel is not ineffective for failing to advocate a meritless position." *Payne*, 285 Mich App at 191.

## V. SENTENCING

---

[8] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

-12-

Finally, defendant argues that he is entitled to resentencing because the trial court relied on the mandatory sentencing guidelines, which have since been rendered advisory. We disagree.

Defendant failed to preserve the issue of judicial fact-finding by raising the issue "at sentencing, in a motion for resentencing, or in a motion to remand." *People v Terrell*, 312 Mich App 450, 464 n 40; 879 NW2d 294 (2015), lv held in abeyance ___ Mich ___; 878 NW2d 480 (2016) (citation and quotation marks omitted). Therefore, review of this issue is for plain error affecting defendant's substantial rights. *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015).

In *Lockridge*, 498 Mich at 364, our Supreme Court held that Michigan's sentencing guidelines are unconstitutional to the extent that they require judicial fact-finding beyond facts admitted by the defendant or found by the jury to score offense variables (OVs) that mandatorily increase the floor of the sentencing guidelines minimum sentence range. The Court held that in order to avoid any Sixth Amendment violation, Michigan's sentencing guidelines are to be deemed advisory, instead of mandatory. *Id*. at 391. The Court expressly articulated what is necessary to establish a plain error warranting appellate relief in cases involving an unpreserved Sixth Amendment claim. *Id*. at 394. The Court concluded that in cases

> in which (1) facts admitted by the defendant and (2) facts found by the jury were sufficient to assess the minimum number of OV points necessary for the defendant's score to fall in the cell of the sentencing grid under which he or she was sentenced, . . . because the defendant suffered no prejudice from any error, there is no plain error and no further inquiry is required. [*Id*. at 394-395.]

In this case, defendant admits that facts found by the jury were sufficient to assess the minimum number of points necessary for his score to fall in the cell of the sentencing grid under which he was sentenced. Accordingly, defendant did not suffer prejudice from any error, and no further inquiry is required. See *Lockridge*, 498 Mich at 394-395.

Affirmed.

/s/ Deborah A. Servitto
/s/ Cynthia Diane Stephens
/s/ Amy Ronayne Krause