MARKMAN, J.
The issue here is whether, in violation of Miranda v Arizona, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), defendant was subjected to “interrogation” or, more specifically, “express questioning or its functional equivalent,” Rhode Island v Innis, 446 US 291, 300-301; 100 S Ct 1682; 64 L Ed 2d 297 (1980), after he invoked his *191 right to remain silent. Because we agree with the Court of Appeals that defendant was not subjected to such questioning after he invoked his right to remain silent, we affirm the judgment of the Court of Appeals, which correctly reversed the trial court’s decision to suppress defendant’s voluntarily given confession.
I. FACTS AND PROCEDURAL HISTORY
Defendant allegedly turned a drug buy into an armed robbery by pulling out a gun instead of proffering cash. He and the victim allegedly struggled over the gun, the gun went off, and the victim was killed. Defendant was then taken into custody. After a police officer read defendant his Miranda rights, the following colloquy, which was recorded on a DVD, immediately ensued:
[Officer}: Okay. This is what they call the acknowledgement and waiver paragraph. I’m going to read this to you. If you wish to talk to me, I’m going to need you to sign and date [the] form. Even though you sign and date the form, you still have your rights to stop at any time you wish. Do you understand that?
[Defendant}: No. No thank you sir. I’m not going to sign it.
[Officer}: Okay. Okay. Sounds good.
[Defendant}: I don’t even want to speak.
[Officer}: I understand. I understand Kadeem. Okay then. The only thing I can tell you Kadeem, is good luck man. Okay. Don’t take this personal. It’s not personal between me and you, I think I may have had one contact with you on the street. Okay. I’ve got to do my job. And I understand you’ve got to do what you’ve got to do to protect your best interests. Okay. The only thing that I can tell you is this, and I’m not asking you questions, I’m just telling you. I hope that the gun is in a place where nobody can get a hold of it and nobody else can get hurt by it, okay. All right.
*192 [Defendant]: I didn’t even mean for it to happen like that. It was a complete accident.
[Officer]: I understand. I understand. But like I said, you, uhh, you get your attorney, man. Hey, look dude, I don’t think you’re a monster, all right. I don’t think that. You could have came down to me and turned yourself in and there ain’t no damn way I’d beat you up. Yeah. Okay, man? You all set, you straight with me? Who knows you’re here? Who knows of your family? Because I know a lot of your family in town now.
[Defendant]: I know that I didn’t mean to do it. I guarantee that, I know I didn’t mean to do it.
[Officer]: Does your dad know you’re down here?
[Defendant]: Yeah.
Defendant was charged with first-degree felony murder, MCL 750.316(1)(b), armed robbery, MCL 750.529, and possession of a firearm during the commission of a felony, MCL 750.227b. Before trial, defendant moved to suppress his statement to the police officer. The trial court granted defendant’s motion, finding the officer’s comment — “I hope that the gun is in a place where nobody can get a hold of it and nobody else can get hurt by it” — to be the functional equivalent of express questioning, which is prohibited after a defendant has invoked his right to remain silent. In a published, and split, decision, the Court of Appeals reversed. People v White, 294 Mich App 622; 823 NW2d 118 (2011). The majority held that the officer’s comment did not constitute the functional equivalent of express questioning under Innis and thus that there was no constitutional violation. The dissent would have suppressed the confession because, with the word “okay” appended to his expression of concern regarding the firearm, the officer’s comment constituted an express question. At the very least, the dissent concluded, the officer’s comment constituted the functional equivalent of a question and was thus prohibited. This Court *193 granted defendant’s application for leave to appeal. People v White, 491 Mich 890 (2012).
II. STANDARD OF REVIEW
Because the pertinent facts here are undisputed, we review de novo the trial court’s decision regarding whether defendant was subjected to “interrogation” or, more specifically, “express questioning or its functional equivalent.” Innis, 446 US at 300-301. We agree with the Court of Appeals dissent that the majority erred by applying the “clear error” standard of review in evaluating whether such questioning occurred. As the dissent explained, given that the facts are undisputed, the de novo standard of review, not review for clear error, is applicable. See People v Attebury, 463 Mich 662, 668; 624 NW2d 912 (2001) (“To the extent that a trial court’s ruling on a motion to suppress involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo.”). However, this error was harmless because the majority held that “[e]ven under a de novo review of the evidence,... we conclude, as did the trial court, that no express questioning occurred.” White, 294 Mich App at 633.
III. ANALYSIS
The Fifth Amendment of the United States Constitution provides that “[n]o person shall... be compelled in any criminal case to be a witness against himself. .. .” US Const, Am V See also Const 1963, art 1, § 17. Notwithstanding the apparent textual focus of the Fifth Amendment on whether a defendant’s confession was undertaken voluntarily and without coercion,[1] the *194 United States Supreme Court has held since Miranda that in the context of a “custodial interrogation,” advising a defendant of his Miranda rights[2] is necessary to protect his constitutional privilege against self-incrimination, and “[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.” Miranda, 384 US at 444, 473-474. If the police continue to “interrogate” the defendant after he has invoked his right to remain silent, and the defendant confesses as a result of that “interrogation,” the confession is inadmissible. Id. at 444-445. However, Miranda also clarified that voluntarily given confessions that are not the result of impermissible custodial interrogations remain admissible:
In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement *195 that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today. [Id. at 478.]
In this case, there is no question that defendant was in “custody” and that after defendant was read his Miranda rights, he invoked his right to remain silent. Thus, the question here is whether, after defendant invoked his right to remain silent, he was then subjected to “interrogation.”
In Innis, 446 US at 300-302, the United States Supreme Court explained the circumstances under which a defendant is deemed to have been subjected to “interrogation”:
[T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term “interrogation” under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response. [Emphasis in the original.]
*196 The Court further explained, however, that the underlying intent of the police is not irrelevant:
[I]t may well have a hearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect. [Id. at 301 n 7.]
But again, as one academic commentator explained, the focus must be on the objective manifestation of the officer’s words rather than on the officer’s subjective intentions in speaking the words:
[T]he best reading of the Innis test is that it turns upon the objective purpose manifested by the police. Thus, an officer “should know” that his speech or conduct will be “reasonably likely to elicit an incriminating response” when he should realize that the speech or conduct will probably be viewed by the suspect as designed to achieve this purpose. To ensure that the inquiry is entirely objective, the proposed test could be framed as follows: if an objective observer (with the same knowledge of the suspect as the police officer) would, on the sole basis of hearing the officer’s remarks, infer that the remarks were designed to elicit an incriminating response, then the remarks should constitute “interrogation.” [2 LaFave, Criminal Procedure (3d ed), § 6.7(a), p 757, quoting White, Interrogation Without Questions: Rhode Island v. Innis and United States v. Henry, 78 Mich L R 1209, 1231-1232 (1980) (emphasis in the original).]
On the basis of the foregoing principle, Innis concluded that the defendant was not “interrogated” within the meaning of Miranda. The defendant had been suspected of robbing and killing taxicab drivers with a sawed-off shotgun. When the police arrested him, they repeatedly read him his Miranda rights, and *197 the defendant invoked his right to counsel. On the way to the police station, the defendant was in the backseat of a squad car accompanied by three officers. The officers were having a conversation and one of them stated that there were “a lot of handicapped children running around in this area” because a school for handicapped children was located nearby, and “God forbid one of them might find a weapon with shells and they might hurt themselves.” Innis, 446 US at 294-295. In the course of this conversation, the officers were interrupted by the defendant, who directed them to turn the squad car around so that he could show them where the gun was hidden.
The Court held that the defendant had not been “interrogated” in violation of Miranda because he was neither subjected to “express questioning” nor its “functional equivalent.” Regarding the latter, the Court noted that (1) “[t]here is nothing in the record to suggest that the officers were aware that the respondent was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children”; (2) “[n]or is there anything in the record to suggest that the police knew that the respondent was unusually disoriented or upset at the time of his arrest”; (3) “the entire conversation appears to have consisted of no more than a few offhand remarks”; (4) “[t]his is not a case where the police carried on a lengthy harangue in the presence of the suspect”; (5) “[n]or does the record support the respondent’s contention that, under the circumstances, the officers’ comments were particularly ‘evocative.’ ” Id. at 302-303. Finally, the Court held that the lower court had “erred ... in equating ‘subtle compulsion’ with interrogation” because even when there is subtle compulsion, “[i]t must also be established that a suspect’s incriminating response was the product of words or actions on *198 the part of the police that they should have known were reasonably likely to elicit an incriminating response.” Id. at 303.
In the instant case, we agree with the Court of Appeals that defendant was not subjected to “express questioning” after he invoked his right to remain silent. First, a “question” asks for or invites a response. Id. at 302 (holding that the respondent was not subjected to “express questioning” because “no response from the respondent was invited”); Random House Webster’s College Dictionary (2001) (defining “question” as “a sentence in an interrogative form addressed to someone in order to get information in reply” or “the act of asking or inquiring”). The officer’s comment in this case — “I hope that the gun is in a place where nobody can get a hold of it and nobody else can get hurt by it” — was not a question because it did not ask for an answer or invite a response. It was a mere expression of hope and concern.
Second, the officer’s addition of the words “okay” and “all right” at the end of his comment did not transform a non-question into a question. This is especially obvious when the conversation is considered in its entirety, as it must be, because the officer repeatedly used the words “okay” and “all right” in a manner that failed to garner any response from defendant. See Acosta v Artuz, 575 F3d 177, 191 (CA 2, 2009) {“Innis calls upon courts to consider police conduct in light of the totality of the circumstances in assessing whether the police ‘should have known’ that their actions ‘were reasonably likely to elicit an incriminating response.’ ”), quoting Innis, 446 US at 303. We agree with Justice CAVANAGH that
it is not unusual for people to use certain words or phrases repeatedly while speaking without intending for those *199 words to have significant meaning. In fact, during the approximately five-minute-long colloquy between Stiles and defendant, Stiles repeatedly used the phrases “okay” and “all right” to punctuate statements, apparently without intending to extract a response from defendant. [Post at 212-213.]
Indeed, the officer used the word “okay” 17 times during the 5-minute conversation, and yet defendant only “responded” 3 times, including the “response” that is at issue in this case, and the other 2 “responses” — if that is even a proper characterization of what defendant’s statements amounted to — were simply “yeah” and “okay.” Similarly, the officer used the phrase “all right” 4 times during the 5-minute conversation and only in this one instance did defendant again “respond,” and, as discussed later in this opinion, that “response” was in no way responsive to the officer’s statement because defendant said nothing about the gun — the very matter that had been the subject of the officer’s statement. Moreover, from our own review of the video of the interview, the officer’s comment, at least in our judgment, does not at all sound like a question. That is, the officer did not say the words “okay” and “all right” in a manner and with an emphasis that would have made a reasonable person believe that a response was expected. Instead, the use of these words reflected essentially a verbal tic on the officer’s part meaning, “Okay, all right, I have finished my thought.”
Furthermore, immediately before the officer made the statement at issue, he said, “I’m not asking you questions, I’m just telling you.” Although this is certainly not dispositive of whether what follows constituted a “question,” it is nevertheless relevant with regard to whether the officer reasonably should have expected an answer. The very utterance itself made it less likely either that the officer would have reasonably *200 expected defendant to answer with an incriminating response or that defendant would have proffered an incriminating response.[3]
Moreover, as previously noted, the fact that defendant’s “response” to the officer’s comment concerning the location of the gun did not have anything at all to do with the location of the gun also reinforces the conclusion that the officer’s comment here was not a question. If it was a question, defendant certainly did not answer it. Instead, defendant said: “I didn’t even mean for it to happen like that. It was a complete accident.” If defendant was answering the officer’s “question,” one would think that he would have said something about the location of the gun, but he did not, and this, in our judgment, underscores that the officer’s comment was not a question to begin with.
In addition, the fact that the officer responded to defendant’s incriminating statement by saying, “[Y]ou, uhh, you get your attorney, man,” and then asking defendant if his family knew that he was there, suggests that the officer was not expecting or trying to obtain an incriminating response from defendant. Instead, it seems that the officer was taken somewhat by surprise by defendant’s incriminating statement, and he immediately sought to veer the conversation away from any *201 further incriminating statements. The fact that the officer was caught off guard by defendant’s incriminating statement further underscores that the officer’s comment was not “designed to elicit an incriminating response . . . .” Innis, 446 US at 302 n 7.
Finally, to the extent that the officer’s statement can even be reasonably viewed as a question, this particular question does not seem intended to generate an incriminating response.[4] Instead, if anything, the officer was *202 simply trying to ensure that defendant heard and understood him. As the Court of Appeals explained:
[W]e conclude, as did the trial court, that no express questioning occurred. After defendant invoked his right to remain silent, the detective informed defendant that he was not asking any more questions and was only going to make a statement. The brief statement was made, and though the detective stated “okay” and “alright” after the statement, the video makes clear that in context the detective was seeking affirmation that defendant heard the statement, not that he was seeking a response to the statement. And the detective’s response once defendant blurted out an incriminating statement shows he had not intended that there be any sort of substantive response to the statement. Consequently, there was no express questioning of defendant. [White, 294 Mich App at 633-634.]
We further agree with the Court of Appeals that defendant was not subjected to the “functional equivalent” of express questioning after he invoked his right to remain silent. Just as in Innis, there is nothing in the record to suggest that the officer was aware that defendant was “peculiarly susceptible to an appeal to his conscience” concerning the safety of others. Innis, 446 US at 302. Justice CAVANAGH asserts that the officer’s comment about the gun “played to the likelihood that defendant would respond to an expression of concern for the safety of others.” Post at 225 (emphasis added). However, we have a difficult time fathoming that the officer believed that defendant was “peculiarly susceptible to an appeal to his conscience,” especially where defendant had just been arrested for shooting another man to death for drugs. That is, under these circumstances, and absent any evidence of defendant’s *203 peculiar susceptibility, we are not persuaded that the officer here should have known that “defendant would perceive the [officer’s] comments as compelling a response in order to protect others . . . Post at 227.
Although Justice CAVANAGH states that “several of defendant’s individual personal characteristics increased the likelihood that he would perceive Stiles’s comments as requiring a response,” post at 229, he only articulates two such characteristics: “defendant’s youth and inexperience with the criminal justice system, ” post at 228-229. However, the mere fact that defendant was 17 years old and inexperienced in the criminal justice system does not mean that he was “peculiarly susceptible to an appeal to his conscience” or “unusual[ly] susceptible] ... to a particular form of persuasion . . . .” Innis, 446 US 302.[5] Indeed, not even defendant himself has argued that he possesses any personal characteristics that made it more likely that he would feel compelled to respond to the officer’s comment about the gun. And indeed, as previously discussed, defendant never did truly “respond” to the officer’s comment about the gun — he never told the officer where the gun was. Therefore, the alleged importun-ings of the officer with regard to the safety of other persons must not have moved defendant excessively or weighed too heavily on his conscience.[6]
*204 Also, just as in Innis, there is nothing in the record to suggest that the officer here was aware that defendant was “unusually disoriented or upset at the time of his arrest.” Innis, 446 US at 303. Furthermore, the officer only made a single remark about the gun. “This is not a case where the police carried on a lengthy harangue in the presence of the suspect.” Id. Nor was the officer’s remark “particularly ‘evocative.’ ” Id. Indeed, the officer’s comment in the instant case was far less “evocative” than the officer’s comment in Innis. In Innis, the officer said, “[Tjhere’s a lot of handicapped children running around in this area, and God forbid one of them might find a weapon with shells and they might hurt themselves.” Id. at 294-295. In the instant case, the officer said, “I hope that the gun is in a place where nobody can get a hold of it and nobody else can get hurt by it....” Unlike the officer in Innis, the officer here did not invoke God or handicapped children. And even if the officer’s remark could be considered “subtle compulsion,” Innis held that “subtle compulsion” is not “interrogation.” Id.[7]
*205 Justice CAVANAGH is correct that the instant case is factually distinguishable from Innis in the sense that the officers in Innis were talking to themselves, and not directly to the defendant, about the gun, whereas in the instant case, the officer was clearly talking directly to defendant about the gun given that defendant was the only other person in the room.[8] However, we do not *206 believe that this difference alone requires a different outcome.[9] As the Court of Appeals explained, “federal courts have repeatedly held that revealing evidence or other facts directly to the defendant does not constitute the functional equivalent of questioning, absent any of the other Innis criteria.” White, 294 Mich App at 635. For example, in Fleming v Metrish, 556 F3d 520, 523 (CA 6, 2009), when an officer told the suspect after the suspect had invoked his right to remain silent that “things did not look good for him and that ‘maybe he needed to do the right thing’ ” and asked the suspect if he now wanted to talk to the lead detective, the court held that this did not constitute “interrogation.” The *207 court specifically rejected that there was a significant distinction between the officers’ conversation in Innis and the comments directed to the defendant:
We recognize that Innis is arguably distinguishable on the basis that the conversation in Innis occurred between two police officers, and was not directed toward the suspect himself. Officer Clayton’s brief remarks were, in contrast, clearly aimed at Fleming. Such a distinction might be significant if an officer’s brief remarks morphed into, for example, a “lengthy harangue” because, other things being equal, extended comments directed toward a suspect are more likely to elicit an incriminating response. But this court has previously rejected a constitutional challenge to cursory comments aimed at a suspect in an analogous context. See United States v. Hurst, 228 F.3d 751, 760 (6th Cir.2000) (holding that “the mere statement by [a law-enforcement official] that ‘we’ve got good information on you,’ viewed in context, contains no compulsive element suggesting a Fifth Amendment violation under the circumstances.”). [Id. at 527 (alteration in the original).]
Indeed, “courts have generally rejected claims . . . that disclosure of the results of a lineup or other inculpatory evidence possessed by the police, without more, constitutes ‘interrogation’ under Innis.” Acosta, 575 F3d at 191. See, for example, Easley v Frey, 433 F3d 969, 974 (CA 7, 2006) (holding that informing the defendant that an eyewitness was willing to testify against him and that if convicted he could be subject to the death penalty did not constitute “interrogation”); United States v Payne, 954 F2d 199, 203 (CA 4, 1992) (holding that informing the defendant that a gun was found at his home did not constitute “interrogation”); Shedelbower v Estelle, 885 F2d 570, 572-573 (CA 9, 1989) (holding that informing the defendant that his accomplice had been arrested and that the victim had identified him as one of her assailants after being shown his photograph did not constitute “interrogation”); People v McCuaig, *208 126 Mich App 754, 760; 338 NW2d 4 (1983) (holding that “the statements made by the police officer, which merely advised defendant of the crime with which he was charged and which described the events which led to that charge, cannot be characterized as further interrogation by the officer or its functional equivalent”); People v Kowalski, 230 Mich App 464, 467-469, 483; 584 NW2d 613 (1998) (holding that informing the defendant that his accomplice had given a statement and inquiring whether the defendant still wanted an attorney did not constitute “interrogation”).
Accordingly, direct statements to the defendant do not necessarily constitute “interrogation.”[10] Again, the dispositive question is whether the “suspect’s incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response.” Innis, 446 US at 303. And for the reasons set forth, we do not believe that defendant’s incriminating response in this case can be characterized as such a product. As the Court of Appeals explained:
[NJothing in the record suggests that the detective was aware of any peculiar susceptibility of defendant (or that he even had any). So, focusing on what defendant would have perceived from the statement in its context, we can only conclude that Detective Stiles should not have reasonably expected defendant to make an incriminating statement. After all, Detective Stiles had already told defendant both that he was not asking a question and that he *209 understood defendant’s invocation of his right to remain silent. Amidst these other permissible comments — and absent any known sensitivities of defendant — it would not be reasonable to conclude that the one comment about the possibility of the gun being located and endangering others would result in a statement about the crime itself. Just as importantly, this “is not a case where the police carried on a lengthy harangue in the presence of” defendant, nor was Detective Stiles’s comment “evocative.” Innis, 446 US at 302-303. And these latter two points make any distinction between a direct remark made to defendant and a defendant overhearing remarks between police as in Innis insufficient to come to a different constitutional conclusion. [White, 294 Mich App at 632.]
IV CONCLUSION
For these reasons, we agree with the Court of Appeals that defendant was not “interrogated” in violation of Miranda. Therefore, we affirm the judgment of the Court of Appeals, which reversed the trial court’s decision to suppress defendant’s voluntarily given confession. Defendant’s confession must be made fully available to the jury in its pursuit of the truth with regard to what occurred in this case.
YOUNG, C.J., and ZAHRA, J., concurred with MARKMAN, J.

 Before Miranda, the admissibility of a confession depended on its voluntariness. See Bram v United States, 168 US 532, 542-543; 18 S Ct *194 183; 42 L Ed 568 (1897) (“ ‘[A] confession, in order to be admissible, must be free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.’ ”) (citation omitted); Hardy v United States, 186 US 224, 229; 22 S Ct 889; 46 L Ed 1137 (1902) (“[Sltatements which are obtained by coercion or threat or promise will be subject to objection.”); Malloy v Hogan, 378 US 1, 7; 84 S Ct 1489; 12 L Ed 2d 653 (1964) (“[T]he constitutional inquiry is not whether the conduct of state officers in obtaining the confession was shocking, but whether the confession was ‘free and voluntary ....’ ”).

 That is, “[plrior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.” Miranda, 384 US at 444.

 We generally agree with Justice CAVANAGH that although “such statements do not magically transform what would otherwise be an express question into a constitutionally benign comment,” “such qualifying statements might, in some situations, be relevant to a court’s consideration of the totality of the circumstances ....” Post at 211-212. Indeed, we believe that such prefatory language will almost always be of at least some relevance to the court’s “totality of circumstances” analysis in the sense that, whatever the subjective intentions of the officer, his disclaimer that no question is being asked, and thus that no answer is expected, can be assumed to have at least some deterrent effect on a defendant in answering the “question” on the assumption that the officer means what he says. *202 dissenting Court of Appeals judge has specifically asserted that the officer must have subjectively intended to coerce defendant to respond to the officer’s comments.

 The Court of Appeals dissent stated that “it is difficult to conceive of another reason” for the officer to have said what he did other than to get defendant to make an incriminating statement. White, 294 Mich App at 639 (Shapiro, EJ., dissenting). However, perhaps the officer was simply genuinely concerned about somebody getting hold of the gun and injuring either themselves or somebody else. Just as
“in Innis, there is a basis for concluding that the officer’s remarks were made for some purpose other than that of obtaining evidence from the suspect” because an “objective listener could plausibly conclude that the policemen’s remarks in Innis were made solely to express their genuine concern about the danger posed by the hidden shotgun.” [2 LaFave at 757 n 20, quoting White, 78 Mich L R at 1234-1235 (emphasis in the original).]
See also Innis, 446 US at 303 n 9 (“ [I]t was ‘entirely understandable that [the officers] would voice their concern [for the safety of the handicapped children] to each other.”) (alterations in the original). Furthermore, given that after the officer said something about the gun, he asked defendant if his family knew where he was, perhaps the officer was hoping that defendant might tell a family member where the gun was if it was not in a safe location so that a family member could ensure that the gun was moved to a safe location. Finally, “the mere fact that a police officer may he aware that there is a ‘possibility’ that a suspect may make an incriminating statement is insufficient to establish the functional equivalent of interrogation.” United States v Taylor, 985 F2d 3, 8 (CA 1, 1993), citing Arizona v Mauro, 481 US 520, 528-529; 107 S Ct 1931; 95 L Ed 2d 458 (1987) (“Officers do not interrogate a suspect simply by hoping that he will incriminate himself.”). Contrary to Justice Cavanagh’s intimation, we fully recognize that the officer’s subjective intent is not dispositive. However, as Innis, 446 US at 301 n 7, explained, such intent is not “irrelevant” either, and it is especially not “irrelevant” when a

 In the case relied on heavily by Justice Mary Beth Kelly — JDB v North Carolina, 564 US_; 131 S Ct 2394, 2398, 2406; 180 L Ed 2d 310 (2011), which, unlike the instant case, involved a 13-year-old boy — the United States Supreme Court held that although “the age of a child subjected to police questioning is relevant to the custody analysis of Miranda,” “[tjhis is not to say that a child’s age will be a determinative, or even a significant, factor in every case.”

 Justice Kelly contends that we focus exclusively on the officer’s comment about the gun and ignore his “references to violence and attempts to earn defendant’s trust through expressions of understanding and references to defendant’s family.” Post at 235 n 20. The only *204 purported “reference to violence” was the officer’s statement: “You could have came down to me and turned yourself in and there ain’t no damn way I’d beat you up.” That is, the officer said that he would not have beat defendant up. Accordingly, the officer’s statement is probably better understood as a reference to nonviolence than to violence. And while it is true that the officer did refer to defendant’s family and did render expressions of understanding, we hardly believe that these statements transformed a non-interrogation into an interrogation. Nor do we do not believe that police officers violate the United States Constitution by rendering expressions of understanding to suspects or by inquiring as to whether their families are aware that they are in custody.

 Contrary to Justice Cavanagh’s contention, Mauro did not hold that subjecting a suspect to “psychological ploys” constitutes “interrogation.” Post at 223-224. Mauro simply noted that the defendant in that case had not been subjected to “psychological ploys.” Mauro, 481 US at 529. This by no means indicates that “psychological ploys” necessarily constitute “interrogation.” Indeed, as previously discussed, Innis, 446 US at 303, ex *205 pressly held that “subtle compulsion” does not constitute “interrogation.” See also Acosta, 575 F3d at 189 (stating that “police conduct would not qualify as interrogation simply because it ‘struck a responsive chord’ in a defendant”), quoting Innis, 446 US at 303. Furthermore, we do not view what happened here as a “psychological ploy” at all. Justice CAVANAGH contends that “the record is devoid of any support for the majority’s speculation regarding Stiles’s subjective intent in making the statements at issue.” Post at 220 n 2. However, the record is equally devoid of any contrary subjective intent, and why should an officer of the law expressing concern about the risk to others being posed by an abandoned firearm be presumed to be engaged in a “psychological ploy”? Why can’t it be presumed, absent more, that the expression of such a concern is sincere and genuine and an altogether legitimate aspect of the officer’s professional responsibilities? Indeed, it is difficult to imagine a more legitimate concern that an officer of the law might express.

 Justice Cavanagh relies heavily on In re EG, 482 A2d 1243 (DC, 1984), for the proposition that whether the officer was talking directly to the defendant is a significant factor. In In re EG, the officer was told that a man wearing a beige hat and dark sunglasses had just committed an armed robbery. When the officer stopped the defendant and found a beige hat and dark sunglasses in the defendant’s pocket, the officer said: “Here is the sunglasses and the hat. I wonder where the gun and money is [sic].” Id. at 1245. The defendant responded, “I gave it to my partner.” Id. The District of Columbia Court of Appeals held that the officer’s statement constituted “interrogation” because “there was no understandable explanation for [the officer’s] rhetorical question other than to elicit a response from appellant.” Id. at 1248. In the instant case, however, as previously discussed, there is a reasonable explanation for the officer’s comment other than to elicit an incriminatory response from defendant — a genuine and legitimate concern about the danger posed by the missing gun. In re EG is also distinguishable from the instant case because in that case, the defendant was never told that he had a right to remain silent, while in the instant case defendant was informed that he had a right to remain silent, he invoked that right, and before the officer made the comment about the gun he specifically told defendant that it *206 was a statement, not a question. Finally, in In re EG, the officer made the comment while his service revolver was drawn and the defendant had his hands on the roof of the officer’s police cruiser, while here the officer made the comment during a completely civil conversation with defendant at the police station. Therefore, not only is In re EG, of course, not binding on this Court, but it is also distinguishable on significant grounds.

 Contrary to Justice Cavanagh’s contention, we do not “fail[] to give proper consideration to the context in which the statements were made.” Post at 218 (emphasis in the original). Instead, we are fully cognizant that the officer’s comments at issue here were made in a distinct context from those at issue in Innis, because while the officer in Innis was speaking to another officer, the officer here was speaking to the defendant himself. However, this appears to be the only contextual difference relied on by Justice Cavanagh (other than that the defendant in Innis was in a police car, while the defendant here was in a police interrogation room, which we believe is a distinction without a meaningful difference), and for the reasons explained above, we do not believe that this distinction by itself, although certainly a distinction, compels a different result. And contrary to Justice Cavanagh’s intimation, the fact that two of the dissenting justices in Innis opined that the officers’ “remarks ‘would obviously have constituted interrogation if they had been explicitly directed to respondent’ ” is of little relevance because they were dissenting. Post at 219, quoting Innis, 446 US at 305 (Marshall, J., dissenting). What is relevant is that the majority in Innis did not rely on the fact that the officers were not talking directly to the defendant in its analysis of whether the officers subjected the defendant to the functional equivalent of express questioning.

 Although we recognize that none of the cited decisions fully addresses the specific circumstances at issue here — few criminal cases are factually identical — these decisions are nonetheless helpful in resolving the present question because they all stand in common for the proposition that direct statements to a defendant do not necessarily constitute “interrogation.” Therefore, the fact that the statement at issue here was a direct statement to defendant cannot, by itself, support Justice Cavanagh’s conclusion that the officer’s statement constituted “interrogation.”