# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

RICHARD JOSEPH HODGE,

Defendant-Appellant.

UNPUBLISHED
May 10, 2018

No. 336754
St. Clair Circuit Court
LC No. 16-001447-FH

Before: CAVANAGH, P.J., and STEPHENS and SWARTZLE, JJ.

PER CURIAM.

Defendant appeals as of right from his convictions of operating or maintaining a laboratory involving methamphetamine, MCL 333.7401c(2)(f), and maintaining a drug house, MCL 333.7405(1)(d). He was sentenced as a fourth habitual offender, MCL 769.12, to serve 10 to 25 years in prison for operating and maintaining a methamphetamine lab and 2 to 15 years for maintaining a drug house. We affirm.

## I. BACKGROUND

Lieutenant Matthew King and other officers executed a search warrant at defendant's house in Port Huron. Two people, Heather Atkins and Matthew Powell, were found outside the residence and were secured by another officer. Lieutenant King found defendant sleeping in his bedroom and handcuffed him. Other law enforcement officers discovered what they determined was a methamphetamine lab in the bathroom, so all officers evacuated the house, taking defendant outside along with another man they found in the house, Justin Wakeham. Lieutenant King noticed that defendant was barely awake and looked rough, unkempt, and dazed. As Lieutenant King stood outside with defendant, Deputy Nathan Zuzga, the officer in charge of the investigation, walked up.

Deputy Zuzga testified that defendant was handcuffed and in custody and remained at the house for approximately 20 to 30 minutes after the search warrant was executed. There was an ambulance already on scene at the time he encountered defendant because Powell required medical attention. Deputy Zuzga observed that defendant looked terrible; that he was pale and his eyes were sunken in. The deputy testified that he asked defendant if he was okay, and whether he had been up for a while. When defendant held out three fingers, Deputy Zuzga asked if he had been up for three days, and defendant nodded yes. The deputy then asked defendant if

-1-

he needed medical attention, and defendant shook his head no. Deputy Zuzga did not question defendant any further until they arrived at the police station, and did not enter the information about this conversation into his report.

After the house had been cleared of people, evidence technician Deputy Andrew Young arrived at the house wearing protective gear. In the bathroom he found everything needed to manufacture methamphetamine. This included a bottle of muriatic acid, a cold-pack wrapper, Zippo lighter fluid, needle-nosed pliers, end cutters, tin foil, mason jars with coffee filters, and a gas-generator hose. It also included lithium strips, lithium battery casings, black electrical tape, a container of lye, and a two-liter soda bottle with rubber tubing taped to the top. Deputy Young field tested a substance found in the bathroom and it tested positive as methamphetamine.

In garbage bags found on the front porch of the house, Deputy Young found additional items commonly used in methamphetamine consumption and production, including straws, used coffee filters without coffee grounds, cut up plastic bottles, tubing with black electrical tape around the ends, batteries, and battery casings. Deputy Young determined that, unlike the evidence found in the bathroom, these items had not been used recently. In the kitchen, Deputy Young found an unused cold pack and, in the bedroom near the kitchen, there was a trash can that held the empty box for the cold pack and a needle, a cardboard shipping container with a digital scale, some packaging material, a pipe, a Michigan health card with defendant's name on it, a plastic baggie, a small utensil, a box of tin foil, a pair of pliers, a lithium battery, a butane lighter, tweezers, a clear container with a white substance inside and a straw next to it, and a syringe with a needle. Again, many of these items were consistent with methamphetamine production and use. Deputy Young took multiple photographs before removing the evidence and those photographs were eventually provided to the jury.

Wakeham agreed to testify against defendant as part of his plea agreement on a charge of operating a methamphetamine lab. Wakeham testified that he had only known defendant for about a month before the raid. He went to defendant's house that afternoon and a man nicknamed "Doo Doo" arrived and provided Wakeham with some methamphetamine. Wakeham and defendant then played video games and smoked the methamphetamine, before defendant went into his bedroom to lie down. Atkins and Powell then arrived and drove Wakeham to the store to pick up some items Wakeham needed to cook methamphetamine. Wakeham had brought batteries, Zippo fluid, and tubing with him to defendant's house. Because other items needed to manufacture methamphetamine were already in the house—including jars, a funnel, tin foil, acid, coffee filters, scissors, and needle-nosed pliers—Wakeham only purchased lye and a few other items at the store. When Wakeham, Atkins, and Powell returned from the store, Wakeham proceeded to cook methamphetamine in defendant's bathroom. Wakeham testified that he had never cooked methamphetamine at defendant's house before, but did not feel he needed defendant's permission. Defendant slept through the cooking of the methamphetamine and woke when the police arrived. Wakeham testified that, while some items in the bathroom were his, nothing in the trash bags belonged to him.

At trial, defense counsel moved to have evidence of the conversation between defendant and Deputy Zuzga excluded as inadmissible under *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966). The trial court denied defendant's motion to exclude the statement, reasoning that Deputy Zuzga had no reason to believe that defendant would be moved

-2-

to make a potentially self-incriminating statement in response to his questions, and, therefore, no custodial interrogation took place.

At the conclusion of the trial, defense counsel requested that the jury be instructed in accordance with M Crim JI 8.1, the mere-presence instruction. The trial court denied defense counsel's request, reasoning that the mere-presence instruction conflicted with the special instruction for operating or maintaining a laboratory involving methamphetamine. The trial court explained that, under the meth-lab instruction, the defendant's presence would be sufficient if he knew or had reason to know that the house was being used to manufacture methamphetamine.

The jury found defendant guilty of the above-mentioned crimes, and this appeal followed.

## II. ANALYSIS

*The Trial Court Did Not Violate Defendant's* Miranda *Rights*. On appeal, defendant first argues that Deputy Zuzga's question about how long defendant had been awake was a custodial interrogation that the officer should have known would elicit an incriminating answer from defendant. Accordingly, defendant argues that the admission of evidence regarding this statement violated his *Miranda* rights.

We review de novo a trial court's ultimate decision on a motion to suppress evidence. *People v Akins*, 259 Mich App 545, 563; 675 NW2d 863 (2003). The trial court's findings of fact, however, are reviewed for clear error. *People v Beuschlein*, 245 Mich App 744, 748; 630 NW2d 921 (2001).

There is no issue that defendant was in custody at the time Deputy Zuzga asked him how long he had been awake. The parties agree that, because defendant was handcuffed and not free to leave the scene, he was in police custody. Therefore, the issues here are whether Deputy Zuzga's questions constituted interrogation and whether the answer elicited was incriminatory.

"The term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *People v White*, 493 Mich 187, 195; 828 NW2d 329 (2013) (internal citation and notation omitted). When determining whether an "interrogation" occurred, the operative question is whether an objective observer who heard the questioning would infer that the questions were designed to elicit an incriminating response. *Id*. at 196. Police conduct is to be considered in light of the totality of the circumstances when making this assessment. *Id*. at 198.

Under the circumstances existing at the time of the questioning, an objective observer would infer that the questions were neither designed nor reasonably likely to elicit a self-incriminating response. Deputy Zuzga observed that defendant looked ill and asked defendant if he was okay and whether he had been up for a while. In response, defendant held out three fingers. Deputy Zuzga asked defendant if his response meant that he had been awake for three days, and defendant nodded his head yes. At that point, Deputy Zuzga was able to determine that defendant's appearance was likely due to sleep deprivation rather than an acute medical

condition requiring assistance from the on-site ambulance. The deputy then provided defendant with an opportunity to obtain medical attention if he wished, and defendant responded in the negative. At this point, the questioning ceased until defendant was taken to the police station.

Given defendant's ill appearance and the availability of an on-site ambulance, an objective observer would conclude that Deputy Zuzga's on-scene questioning of defendant was designed to determine if defendant required emergency medical assistance. This type of exchange is "normally attendant to arrest and custody," see *White*, 493 Mich at 193, and helps ensure the safety of the suspect while in police custody. Indeed, the arresting officers would likely have been negligent if defendant had been ill and they had not determined whether defendant required medical assistance.

Moreover, the answer elicited was only marginally incriminatory, if at all. A reasonable juror might conclude that defendant had been up for three days because he had been consuming methamphetamine. But defendant was not charged with using or possessing the drug. While there might be some evidentiary relationship between someone who uses the drug and the maintaining of a laboratory or drug house, any such relationship would be quite tenuous, at best. Because the question asked was related to defendant's medical needs and the answer had only a tenuous relevance to the charged crimes, we conclude that Detective Zuzga's testimony did not violate *Miranda*.

*Defendant Was Not Entitled to Jury Instruction M Crim JI 8.1.* Defendant next argues that the trial court's refusal to give jury instruction M Crim JI 8.1 denied defendant a fair trial because, under the instructions given, the jury could conclude that defendant's mere presence in the house was enough to convict him. The "trial court's determination that a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007). Questions of law concerning jury instructions are reviewed de novo. *People v McMullan*, 284 Mich App 149, 152; 771 NW2d 810 (2009).

We examine jury instructions in their entirety to determine if there was reversible error. *People v Chapo*, 283 Mich App 360, 373; 770 NW2d 68 (2009). Reversal is required only when the instruction requested is substantially correct, was not covered substantially in the given jury instructions, and the trial court's refusal to give the instruction seriously interfered with the defendant's ability to present a particular defense. *People v Moldenhauer*, 210 Mich App 158, 159-160; 533 NW2d 9 (1995). "To warrant reversal of a conviction, the defendant must show that it is more probable than not that the failure to give the requested instruction undermined the reliability of the verdict." *McMullan*, 284 Mich App at 152.

The jury instruction that defendant requested is entitled "Mere Presence Insufficient" and provides:

> Even if the defendant knew that the alleged crime was planned or was being committed, the mere fact that [he / she] was present when it was committed is not enough to prove that [he / she] assisted in committing it. [M Crim JI 8.5.]

This jury instruction is intended to be used when a defendant is charged under an aider-and-abettor theory. See M Crim JI 8.1, Reference Guide.

Defendant was not charged under an aider-or-abetter theory, but argues that he was otherwise entitled to the instruction because his defense was that he did not know what Wakeham was doing as he slept. The evidence suggested that defendant was not involved in the manufacture of this particular batch of methamphetamine. The mere-presence instruction, however, was not substantially correct in this case because the commission of the charged crimes did not require defendant to manufacture methamphetamine personally, or even to be aware of every single batch that was manufactured.

Regarding defendant's charge for operating or maintaining a methamphetamine laboratory, the trial court correctly instructed the jury that the prosecutor's burden was to prove one of two theories beyond a reasonable doubt. The first theory required proving (1) that defendant owned, possessed, or used the house; (2) that the property was used to manufacture methamphetamine; (3) that defendant knew or had reason to know that the house was used to manufacture methamphetamine; and (4) that the substance manufactured was methamphetamine. The alternative theory required proving (1) that defendant owned or possessed any chemical or laboratory equipment; (2) that defendant knew or had reason to know that the chemical or laboratory equipment was to be used to manufacture methamphetamine; and (3) that the controlled substance was methamphetamine. The trial court also explained that possession meant that defendant had physical control or a right to control the property and that it "is not enough if the Defendant merely knew about the chemicals or laboratory equipment." With regard to defendant's charge for maintaining a drug house, the trial court instructed the jury that the prosecutor had the burden to prove that defendant kept a dwelling that was frequented by persons for the purpose of illegally using, storing, or selling controlled substances and that defendant knew that the dwelling was frequented for one or more of those purposes.

These instructions made clear that defendant's presence in the house was insufficient to convict defendant of the charged crimes. Rather, the jury was to convict defendant only on his knowledge of the illegal activity and control over the instruments or locality of that activity. Because the instructions sufficiently protected defendant's right to put on his defense, the trial court did not err by refusing to instruct the jury in accordance with M Crim JI 8.1.

Affirmed.

/s/ Mark J. Cavanagh
/s/ Cynthia Diane Stephens
/s/ Brock A. Swartzle