*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

CHAVEZ LAWON WYATT,

Defendant-Appellant.

UNPUBLISHED
March 07, 2025
10:03 AM

No. 365660
Genesee Circuit Court
LC No. 2021-048852-FC

Before: RIORDAN, P.J., and YATES and ACKERMAN, JJ.

PER CURIAM.

Sheletha Graves, the mother of defendant Chavez Lawon Wyatt, was shot and killed in her home. After the shooting, defendant swallowed the shell casing from the bullet that was used to kill his mother. Defendant was subsequently convicted by a jury of second-degree murder, MCL 750.317, tampering with evidence, MCL 750.483a(6)(b), possession with intent to deliver heroin, MCL 333.7401(2)(a)(*iii*), felon in possession of a firearm (felon-in-possession), MCL 750.224f, resisting or obstructing a police officer, MCL 750.81d(1), and three counts of carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b. On appeal, defendant argues that he was denied his right to effective assistance of counsel based upon counsel's failure to move to suppress the statements defendant made to the police in violation of *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), and failure to move to suppress evidence. We affirm.

## I. FACTUAL BACKGROUND

Defendant and his brother, Martez Wyatt, lived with defendant's mother, Sheletha Graves, at her house. According to defendant, he and his mother were watching television on the living room couch until just before 10:00 p.m. on the night his mother was shot. Then, defendant picked up his pistol from the ottoman and went to sleep in his room. At some point just after midnight on April 10, 2020, Martez Wyatt was on the phone in his room with his fiancée, Shanika McBride, when he heard a gunshot. Defendant claimed that, while he was sleeping in his room, he awoke to the sound of Martez Wyatt screaming and then found Graves injured on the living room couch. McBride, who was still on the phone, called 911.

-1-

Defendant ran back into his room, grabbed his firearm (a Taurus pistol) and turned on the hallway light. He noticed that the back door was open and grabbed an assault rifle from a hallway closet before running out the back door. After not finding anyone, defendant ran to the neighbor's house to get help. Upon reentering his mother's home, defendant saw a shell casing on the floor. He testified that when he went to grab the shell casing, he was attacked from behind by the police and shot with a taser. During that altercation, he swallowed the shell casing.

Defendant was then placed in handcuffs and put into the back of a patrol vehicle, where he briefly spoke to Detective Sergeant Benjamin Rowell in a four-minute recorded interview. Rowell did not advise defendant of his *Miranda* rights before speaking with him. He introduced himself, asked whether defendant was okay, and stated: "It's my understanding that you may be a witness to, to all this stuff?" During that interview, defendant began to recount the events of the night, but he seemed surprised to learn his mother had been killed.

During the investigation, defendant took part in two more recorded interviews with Rowell. Another interview took place at the Flint Police Department shortly after the shooting. This time, Rowell advised defendant of his rights and that he was under arrest. Defendant responded that he did not want to speak to Rowell any longer. Despite that comment, the interview continued. The third interview occurred on the afternoon of April 12, 2020, after defendant passed the shell casing during a bowel movement. Defendant disclosed that development to a deputy and asked to speak to Rowell about the evidence.

During a pretrial hearing on February 14, 2022, defendant's prior counsel, Monica Wilson, stated that she was working on a motion to suppress evidence and requested a hearing, pursuant to *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965), which was initially set for June 24, 2022. But defendant's case was reassigned from Wilson to a new attorney, David Clark. On August 1, 2022, Clark explained that he had found no law to support a suppression motion and he could not make a "legitimate argument" for the suppression motion Wilson had planned to file.

Defendant's jury trial took place in February and March 2023. In addition to the evidence described above, the jurors heard from witnesses who provided testimony about drugs and firearms recovered at the scene of the shooting, DNA analysis connecting defendant to the Taurus pistol, tool-mark analysis connecting the spent shell casing to the pistol, and autopsy findings. The jury found defendant guilty of second-degree murder, tampering with evidence, felon-in-possession, resisting or obstructing a police officer, three counts of felony-firearm, and possession with intent to deliver 50 grams or more, but less than 450 grams, of heroin.

On March 31, 2023, the trial court sentenced defendant to serve 20 to 40 years in prison for second-degree murder, 4 to 10 years for tampering with evidence, time served for possession of heroin, 29 months to 5 years for felon-in-possession, 2 years for each felony-firearm conviction, and 14 months to 2 years for resisting or obstructing a police officer. Defendant then appealed of right.

## II. LEGAL ANALYSIS

Defendant argues that his trial attorney was ineffective for failing to move to suppress his statements to the police under *Miranda*, 384 US 436, and failing to move to suppress his disclosure

of the shell casing on the basis of an unreasonable delay in his arraignment.[1] A claim of ineffective assistance of counsel is preserved if a defendant moves for a new trial or an evidentiary hearing in the trial court. *People v Head*, 323 Mich App 526, 538-539; 917 NW2d 752 (2018). Also, filing a motion in this Court for a remand for an evidentiary hearing on ineffective assistance of counsel can preserve a defendant's claim. *People v Abcumby-Blair*, 335 Mich App 210, 225; 966 NW2d 437 (2020). Here, defendant did not move for a new trial or for an evidentiary hearing in the trial court. Further, while defendant states in his brief on appeal that he "is seeking remand to expand the evidentiary record in support of remand and initially motion the trial court for a new trial," he has given no indication that he filed a motion to remand with this Court on the issue of ineffective assistance of counsel. Thus, our "review is limited to mistakes apparent from the record." *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012).

To prevail on his claim of ineffective assistance of counsel, "defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome [of the trial] would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). The effective assistance of counsel "is presumed, and the defendant bears a heavy burden to prove otherwise." *People v Mack*, 265 Mich App 122, 129; 695 NW2d 342 (2005). Therefore, the defendant "must overcome the strong presumption that defense counsel's performance was born from a sound trial strategy." *Trakhtenberg*, 493 Mich at 52. "This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight." *People v Rockey*, 237 Mich App 74, 76-77; 601 NW2d 887 (1999). An attorney's "[f]ailure to file a suppression motion is not per se ineffective assistance; a defendant must still demonstrate that his lawyer's performance was objectively unreasonable and that 'but for' that deficient performance, the outcome of the trial would have been different." *People v Serges*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 355554); slip op at 14. Guided by these standards, we must consider whether defendant received ineffective assistance of counsel in either respect that he alleges.

## A.  SUPPRESSION OF DEFENDANT'S STATEMENTS

Defendant asserts that his trial attorney was ineffective for failing to move to suppress the statements defendant made during his three interviews with Detective Sergeant Rowell. Defendant argues that because he was in custody when Rowell first questioned him in the patrol car, Rowell's failure to advise him of his *Miranda* rights violated the Fifth Amendment. The United States and Michigan Constitutions guarantee a defendant's right against self-incrimination. US Const, Am V; Const 1963, art 1, § 17. Police questioning through custodial interrogation implicates this right.

---

[1] Defendant's statement of the question presented frames the issue as whether his trial counsel was ineffective when he "withdrew his predecessor's motion for a *Walker* hearing and stipulated to the admission of the physical evidence and the recordings and transcripts of all three interrogations." Here, the record reveals that a *Walker* hearing was initially set, but defendant's prior attorney never filed a motion to suppress, so there was nothing to withdraw. Also, defendant's argument section frames the issue as "his attorney's failure to move to suppress" his statements and the shell casing. Thus, we shall analyze his argument based on his trial counsel's failure to file a motion to suppress.

*People v Lewinski*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 365350); slip op at 4. In determining whether a defendant is in custody, "courts consider both whether a reasonable person in the defendant's situation would believe that he or she was free to leave and whether the relevant environment presented the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *People v Lafey*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 361936); slip op at 9 (quotation marks and citation omitted). No one circumstance is controlling; rather, the court must consider the totality of the circumstances when deciding whether a suspect was subjected to custodial interrogation under *Miranda*. *Lewinski*, ___ Mich App at ___; slip op at 4.

We agree defendant was in custody during his initial interview with Rowell. A reasonable person in defendant's situation would not have believed that he was free to leave. When Rowell initially approached him, defendant had recently been shot with a taser, restrained with handcuffs, and placed in the back of a police cruiser. Those circumstances also created an inherently coercive environment. See *id*. at ___; slip op at 8 (describing placement in a police car and transportation to a police station as relevant factors in determining whether an environment is coercive).

For purposes of *Miranda*, defendant had to be subjected to interrogation, which "refers to express questioning and to any words or actions on the part of police that the police should know are reasonably likely to elicit an incriminating response from the subject." *Lafey*, ___ Mich App at ___; slip op at 9 (quotation marks and citation omitted). All statements volunteered by a suspect, even when in custody, do not implicate *Miranda*. *Id*. at ___; slip op at 9. We agree that defendant was interrogated during his initial conversation with Rowell. Although the initial interview was short, lasting only four minutes, defendant was expressly questioned several times. Rowell asked defendant whether he was inside the house during the incident, he asked defendant to recount what had happened, and he presented several follow-up questions. The fact that Rowell was questioning defendant as a potential witness and posing questions to find out what happened prior to his arrival on the scene does not change the fact that defendant was subjected to express questioning while in "custody." See *People v White*, 493 Mich 187, 198; 828 NW2d 329 (2013) (observing that express questions ask for or invite a response). Consequently, defendant should have been advised of his *Miranda* rights during his initial encounter with Rowell. But that initial interview yielded nothing of any significance that could be used against defendant, so defendant's claim about the *Miranda* violation at the initial interview necessarily pertains to the second and third interviews as well.

Defendant insists that the "initial improper interrogation . . . led directly to his second semi-waiver of his *Miranda* rights," suggesting that statements he made during subsequent interviews constitute fruits of the initial improper interrogation. "Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Oregon v Elstad*, 470 US 298, 309; 105 S Ct 1285; 84 L Ed 2d 222 (1985). Thus, to obtain exclusion of voluntary statements made after an initial unwarned statement, the questioning must be coercive. *Id*. at 318 ("a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings"). There is no such evidence of coercion in this case.

Defendant also argues that his *Miranda* rights were violated during his second interview at the Flint Police Station because the police continued to question him after he invoked his right to

-4-

remain silent. He also maintains that his statements during his third interview should be suppressed as "fruits" of the violation of his right to remain silent. During custodial interrogation, a suspect has the right to remain silent and cut off police questioning. *People v Henry (After Remand)*, 305 Mich App 127, 145; 854 NW2d 114 (2014). A suspect may assert the right to remain silent at any time, but the assertion of that right "must be unequivocal." *Id*. If the suspect invokes the right to remain silent, "the police must scrupulously honor the defendant's request." *Id*. (quotation marks and citation omitted). But when a suspect reinitiates contact or conversation with the police, then the inquiry turns on "whether the defendant reinitiated a conversation on the subject matter of the investigation and whether, under the totality of the circumstances, the defendant knowingly and intelligently waived his rights to counsel and to remain silent." *People v Clark*, 330 Mich App 392, 418; 948 NW2d 604 (2019).

Here, defendant was advised of his *Miranda* rights at the beginning of the second interview and waived those rights. After Rowell accused defendant of shooting his mother, defendant stated, "I don't want to talk to you no more." Rowell responded, "Listen." The two then had a back-and-forth where defendant asked once again whether he was under arrest, and then asked to be provided water. Rowell left the room, leaving defendant and Trooper Dennis Hartman together. Defendant then asked Hartman, "[h]ow am I under arrest?" Hartman did not pose any follow-up questions, but he commented: "[Rowell] just explained it to you. The problem is, you're leaving out a lot of stuff out of this statement that you gave us. There's more to the story." Hartman further stated: "This is your chance to tell us." Defendant then started to recount the events of the shooting. As that exchange reveals, defendant reinitiated conversation with Hartman by asking him to explain why he was under arrest, and subsequently continued to explain the events of the shooting, without otherwise invoking his right to remain silent.

Because defendant reinitiated the conversation with Hartman, we must consider "whether, under the totality of the circumstances, defendant knowingly and intelligently waived . . . his right to remain silent." *Clark*, 330 Mich App at 421. This analysis requires an inquiry into defendant's "age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his [*Miranda*] rights, and the consequences of waiving those rights." *People v Daoud*, 462 Mich 621, 634; 614 NW2d 152 (2000) (citations omitted; alteration in original). On appeal, defendant does not address whether he can satisfy that standard. Nor is there evidence in the record that defendant's understanding of his *Miranda* rights was compromised by his age, background, or intelligence. Hence, because defendant reinitiated conversation with the police after stating he did not want to speak with them anymore, trial counsel was not ineffective for failing to file a motion to suppress the statements defendant made during his second interview, nor were the statements made in his third interview "fruits" of any violation.

Although defendant's original attorney, Monica Wilson, told the trial court that she planned to file a motion to suppress defendant's statements, Wilson was replaced by attorney David Clark, who decided not to file a suppression motion. Clark discussed the grounds for the intended motion to suppress "at length" with Wilson, but ultimately concluded that "in good conscience," he "found no law to support [defendant's] side that would enable [defendant] to win at a . . . *Walker* hearing," or on a motion to suppress. Therefore, Clark did not file a suppression motion because he decided that such a motion would be meritless. Accordingly, even if defendant's inconsequential remarks during the initial interview could have been suppressed, trial counsel's failure to file a suppression motion does not amount to ineffective assistance of counsel. Because of the validity of defendant's

waivers of his rights under *Miranda* during his second and third interviews, there is no "reasonable probability that the outcome [of the proceedings] would have been different" if counsel had filed a suppression motion. See *Trakhtenberg*, 493 Mich at 51. Thus, defendant has not established a basis for relief resulting from his trial counsel's failure to move to suppress defendant's statements.

## B. SUPPRESSION OF THE SHELL CASING

Defendant insists that his trial attorney was ineffective for failing to move to suppress the shell casing that defendant gave to the police because its disclosure resulted from a presumptively unreasonable delay in his arraignment.[2] Following an arrest, an arraignment must be held "without unnecessary delay." MCL 764.13 (addressing disposition following a warrantless arrest); MCL 764.26 (addressing rights of an alleged felon after arrest). A delay between arrest and arraignment of more than 48 hours is presumptively unreasonable, absent "an extraordinary circumstance." *Co of Riverside v McLaughlin*, 500 US 44, 57; 111 S Ct 1661; 114 L Ed 2d 49 (1991). In such a case, the burden is assigned to "the government to show the existence of a bona fide emergency or other extraordinary circumstances. Absent such a showing, the delay is unreasonable per se under the Fourth Amendment." *People v Manning*, 243 Mich App 615, 631; 624 NW2d 746 (2000). To be sure, "an unnecessary delay does not require automatic suppression . . . ." *Id*. at 643. But as our Supreme Court has explained, if "physical evidence would not have been discovered but for the exploitation by the police of the illegal prearraignment delay, suppression is required." *People v Mallory*, 421 Mich 229, 240; 365 NW2d 673 (1984).

The prosecution admits that the delay between defendant's arrest and his arraignment was presumptively unreasonable because he was arraigned more than 48 hours after he was arrested in the early morning on April 10, 2020. Rowell further acknowledged that 48 hours had elapsed from the time defendant was taken into custody until he was summoned to turn over the shell casing he had swallowed. Therefore, the admissibility of defendant's statements about the shell casing made during the third interview depends upon the voluntariness of his statements, see *People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988), and the admissibility of the shell casing itself depends on whether its discovery was due to the police's exploitation of the delay in arraignment.[3] *Mallory*, 421 Mich at 240.

Defendant passed a spent shell casing in his stool on the morning of April 12, 2020, and he promptly went to a deputy to contact the detectives, maintaining he did not intend to hide the shell casing from the police and he would have mentioned it sooner if he had not been shot with a taser

---

[2] Defendant broadly challenges the "disclosure" of the shell casing as a result of the delay without specifying whether he means the shell casing itself or the statements in his third interview about the shell casing. For the sake of completeness, we shall address both possibilities.

[3] To support the claim that the arraignment was unreasonably delayed, which led to the disclosure of the shell casing, defendant attaches a Genesee County Sheriff's report to his brief on appeal. As the prosecution points out, that report was not contained in the lower court record. Therefore, we decline to consider the report. See *Serges*, ___ Mich App at ___; slip op at 18 (explaining that a party may not expand the record on appeal).

on the night of the shooting. Defendant asked to speak with Rowell and "brought [him] the shell casing[.]" The evidence establishes that defendant solicited the third conversation with the police, which undercuts the theory that the delay in his arraignment rendered his statements involuntary. At the beginning of that interview, Rowell advised defendant of his *Miranda* rights, and defendant agreed to "give [them] up" and answer questions. The record does not reveal that defendant's age or intelligence rendered his statements involuntary, nor is there any indication that defendant was deprived of food, sleep, or medical attention or that defendant was in ill health when he made the statement. See *Cipriano*, 431 Mich at 334. Other than pointing out the unreasonable delay in the arraignment, defendant offers no argument about the voluntariness of statements he made during the third interview or his disclosure of the shell casing.

Further, nothing suggests that defendant's surrender of the shell casing was the product of "exploitation" of the delay in arraignment. *Mallory*, 421 Mich at 240. Instead, defendant readily stated that he would have disclosed the shell casing sooner, but he had no chance to do so because he was shot with a taser. Defendant explained in his interview that "as soon as [the shell casing] came out," he tried to get in touch with Rowell to disclose it. Defendant's repeated statements that he intended to produce the shell casing sooner strongly indicate that his production of the physical evidence was not the result of "the exploitation by the police of the illegal prearraignment delay." *Id*. Indeed, he would have turned over the shell casing regardless of any delay in his arraignment. Thus, trial counsel was not ineffective for failing to file a motion to suppress the shell casing itself or defendant's statements about it during his third interview.

In sum, we conclude that defendant was afforded effective assistance of counsel. Although defendant should have been provided *Miranda* warnings before his first conversation with Rowell, we find no reasonable probability that the filing of a suppression motion would have produced a different outcome. Defendant said nothing significant in his initial interview, and his subsequent statements to the police during his second and third interviews and his disclosure of the shell casing would not have been suppressed or excluded as fruit of the poisonous tree. Defendant's attorney made a sound decision not to file a suppression motion based on those meritless arguments.

Even if defendant had obtained suppression of his initial statement and the shell casing he swallowed, defendant has not shown any reasonable probability that the result of the proceedings would have been different. Defendant made the decision to testify on his own behalf at trial, and his testimony was consistent with his statements to the police during his interviews. Specifically, he denied shooting his mother, and he stated that he woke up to his brother screaming and ran out the back door of the house with the Taurus pistol and an assault rifle to look for the shooter before he ran to a neighbor's house for help. Consistent with his interviews, he stated that the police at the scene attacked him and shot him with a taser before he was taken into custody.

Defendant's second-degree murder conviction was supported by significant evidence, such as testimony that defendant and his brother were the only witnesses at the scene and that his brother was on the phone with McBride when the shooting occurred. There were no signs of forced entry or damage to the home's exterior, but there was evidence that defendant contributed to the DNA profile of a swab taken from the Taurus pistol. Based upon all that evidence and defendant's own testimony, we find no reasonable probability that the outcome of the proceedings would have been different if defendant's trial counsel had filed a suppression motion.

Affirmed.

/s/ Michael J. Riordan
/s/ Christopher P. Yates
/s/ Matthew S. Ackerman