*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

RECO DELMARIO CHASE,

        Defendant-Appellant.

UNPUBLISHED
October 12, 2023

No. 361763
Wayne Circuit Court
LC No. 19-000772-01-FH

Before: MURRAY, P.J., and O'BRIEN and SWARTZLE, JJ.

PER CURIAM.

Defendant appeals as of right his bench trial convictions for one count of felon in possession of a firearm (felon-in-possession), MCL 750.224f, one count of felon in possession of ammunition, MCL 750.224f(6), one count of carrying a concealed weapon (CCW), MCL 750.227, two counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, and one count of possession of less than 25 grams of cocaine (possession of cocaine), MCL 333.7403(2)(a)(*v*). We affirm.

## I. FACTUAL BACKGROUND

This case arises out of the search of a motor vehicle in Lincoln Park, Michigan on January 8, 2019. The search was conducted by Officer Thomas Timmis of the Lincoln Park Police Department following the initiation of a traffic stop for a red-light violation at approximately 10:39 p.m. Prior to approaching the vehicle, a 2004 Pontiac Aztek, Officer Timmis initiated a Law Enforcement Information Network (LEIN) search of the vehicle's license plate. Defendant was driving the vehicle and could not produce his license. Officer Timmis then initiated a second LEIN search, which revealed that defendant was operating the vehicle without a license. Also, per the results of the previous LEIN search of the vehicle's license plate, the Pontiac Aztek was not registered to defendant or the female passenger. Officer Timmis then instructed defendant to exit the car, and as Officer Timmis was handcuffing defendant, he saw a clear cellophane bag filled

with a white powdery substance[1] on the driver's side floorboard. Suspecting that the bag contained cocaine, Officer Timmis also arrested the passenger. Officer Timmis searched defendant's person and found $1,480 in cash in his rear left pocket.

After Officer Timmis secured defendant and the passenger in the patrol car, he searched the vehicle. While examining the center console from the passenger side of the vehicle, Officer Timmis noticed a small gap in the plastic molding by the gear shifter and used a flashlight to illuminate the area, revealing an interior column and "the butt of a gun." Officer Timmis easily removed the plastic molding and cover, which enclosed the wiring for the gear shifter, and recovered a loaded, black, semiautomatic handgun. Officer Timmis preserved the gun and ammunition for fingerprints. When Officer Timmis attempted to determine ownership of the gun through another LEIN search, it revealed that the gun was reported as "stolen, out of Detroit." Officer Timmis also discovered numerous male clothing items in the backseat area and trunk of the car, two children's backpacks, and a 12-ounce Coca-Cola can with a "false compartment" in the driver's side cup holder. The pocket of a blue coat, which Officer Timmis identified as a "male's coat" and which was located on the driver's side backseat, contained the title of the vehicle. The name on the title was not defendant's.

Following the completion of the search of the vehicle, Officer Timmis transported defendant and the passenger to the local police station. Officer Timmis executed an initial strip search of defendant, during which he found a folded Michigan lottery ticket underneath defendant's testicles.[2] Officer Timmis then assisted his partner, Officer Kupser, with a secondary strip search of defendant. The officers recovered a large, knotted, clear plastic bag of suspected cocaine from defendant's underwear. Pursuant to an admitted laboratory report, the aforementioned plastic bag contained approximately 27.91 grams of cocaine.

The day after defendant's arrest, Detective Scott Lavis of the Lincoln Park Police Department was assigned to lead the investigation concerning defendant. Detective Lavis searched the Pontiac Aztek and found defendant's AAA insurance card, several pieces of mail addressed to defendant, and a roll of paper used for printing lottery tickets. The address on defendant's mail matched the address on the registration of the vehicle. Detective Lavis also recovered two cell phones from the vehicle, namely, a gold iPhone and a black LG cell phone.

Detective Lavis then interviewed defendant. Prior to informing defendant of his Fifth and Sixth Amendment rights under *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), Detective Lavis asked defendant his phone number. Detective Lavis testified that when conducting an interview, he follows a standard, pre-printed *Miranda* form and writes the interviewee's name, address, phone number, and date of birth on the form before asking the interviewee to read his or her *Miranda* warnings from the form. Detective Lavis further testified

---

[1] The contents of this bag were not tested, so the prosecutor ultimately moved to dismiss count two, delivery/manufacture of a controlled substance.

[2] Officer Timmis testified that, in his training and experience, lottery tickets are usually used to package fentanyl or heroin.

that he conducts his interviews this same way every time and asks for an interviewee's phone number just in case he needs to contact him or her at a later date.

After the interview, Detective Lavis called defendant's phone number and determined that the gold iPhone belonged to defendant. Detective Lavis stated that he kept defendant's phone on his desk, and it rang and received messages repeatedly. One message defendant received was regarding a website titled "Offer Up" and referred to the sale of a 2004 Pontiac Aztek. Detective Lavis subsequently learned that Offer Up was an online marketplace that operated similarly to Craig's List and requested a search warrant of any Offer Up records associated with defendant's name and phone number. Offer Up subsequently provided law enforcement with business records associated with defendant, which detailed a listing for the 2004 Pontiac Aztek with defendant's phone number as the listed seller. Detective Lavis also discovered an October 22, 2018 traffic ticket defendant received while driving the Pontiac Aztek, demonstrating that defendant drove this vehicle previously.

During the bench trial proceedings, defendant objected to the admission of the phone number, and the evidence acquired thereafter, on the ground that the statement was elicited in violation of *Miranda*, which the trial court overruled. Defendant further filed a motion to exclude the recovered firearm after discovering that the Michigan State Police (MSP) failed to test the exterior of the gun for fingerprints before trial. Officer Timmis and the trial court deputy handled the firearm without gloves, which compromised the integrity of the gun and led to the MSP's subsequent refusal to test the firearm for fingerprints. While defendant advanced that his right to a fair trial was compromised because law enforcement, in bad faith, failed to preserve the authenticity of key and material evidence, the trial court disagreed and denied defendant's motion on September 6, 2019. The trial court found that the officers' conduct was more appropriately characterized as negligence, as opposed to bad faith.

On the final day of the bench trial, September 13, 2019, the trial court convicted defendant as noted above. The trial court found that while the Pontiac Aztek was not registered to defendant, the Offer Up listing associated with defendant's phone number and the previous traffic ticket issued to defendant while he was driving the vehicle demonstrated that defendant exercised dominion and control of the car. Furthermore, the trial court determined that the obvious and apparent gap in the center console lining indicated that defendant was aware of the hidden firearm therein. On May 5, 2021, defendant was sentenced. This appeal followed.

## II. *MIRANDA* VIOLATION

Defendant argues that the trial court erred when it determined that the acquisition of defendant's phone number by Detective Lavis did not constitute a violation of *Miranda*, and thus, did not warrant the exclusion of the phone number and evidence obtained thereafter under the "fruit-of-the-poisonous-tree" doctrine. We disagree.

"We review de novo a trial court's ultimate decision on a motion to suppress on the basis of an alleged constitutional violation." *People v Gingrich*, 307 Mich App 656, 661; 862 NW2d 432 (2014). "Although this Court engages in a de novo review of the entire record, it will not disturb a trial court's factual findings unless those findings are clearly erroneous." *People v Steele*, 292 Mich App 308, 313; 806 NW2d 753 (2011). "A finding is clearly erroneous if, after reviewing

the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *People v Barritt*, 325 Mich App 556, 561; 926 NW2d 811 (2018).

The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." US Const, Am V; Const 1963, art 1, § 17. "To protect this right, police officers must advise a defendant of certain rights before a custodial interrogation." *People v Campbell*, 329 Mich App 185, 202; 942 NW2d 51 (2019), citing *Miranda*, 384 US at 444. "*Miranda* warnings are required when a person is in custody or otherwise deprived of freedom of action in any significant manner." *Campbell*, 329 Mich App at 202 (quotation marks and citation omitted). "Whether a defendant is in custody for purposes of *Miranda* at the time of an interrogation is determined by looking at the totality of the circumstances, with the key question being whether the accused reasonably could have believed that he or she was free to leave." *People v Jones*, 301 Mich App 566, 580; 837 NW2d 7 (2013). "If the custodial interrogation is not preceded by an adequate warning, statements made during the custodial interrogation may not be introduced into evidence at the accused's criminal trial." *Campbell*, 329 Mich App at 202 (quotation marks and citation omitted).

There is no dispute that defendant was in custody when he provided his cell phone number to Detective Lavis; however, the statement was not the result of an interrogation. With respect to whether statements or questions posed by law enforcement to a defendant constitute an interrogation, "the dispositive question is whether the suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." *People v White*, 493 Mich 187, 208; 828 NW2d 329 (2013) (quotation marks and citation omitted). Detective Lavis testified that his typical interview method involved asking a defendant or witness for his or her name, home address, phone number, and date of birth before proceeding to advise the defendant or witness of his or her rights under *Miranda*, which is the procedure he followed with defendant. Moreover, the aforementioned questions were listed on the standard, preprinted *Miranda* form, and Detective Lavis acquired an interviewee's phone number in the event he needed to contact him or her in the future.

Defendant argues that Detective Lavis asked defendant his phone number not just to obtain background information but for an evidence-gathering purpose, namely, to use defendant's phone number to identify which cell phone belonged to defendant. Defendant advances that Detective Lavis then, in fact, used that information to obtain evidence that defendant was trying to sell the Pontiac Aztek and thus persuade the trial court that defendant exercised dominion and control over the vehicle and its contents. While Detective Lavis determined the ownership of the cell phones recovered from the Pontiac Aztek by requesting defendant's phone number, the relevant query is whether "an objective observer (with the same knowledge of the suspect as the police officer) would, on the sole basis of hearing the officer's remarks, infer that the remarks were designed to elicit an incriminating response," as opposed to the subjective perspective of the interviewing officer. *White*, 493 Mich at 196 (quotation marks and citation omitted). Here, the request for defendant's phone number would not lead an objective observer to conclude that the officer's question was designed to elicit an incriminating response. Instead, Detective Lavis's asking for defendant's phone number was a routine question which happened to subsequently lead to evidence of the underlying offenses. Furthermore, when examining the perceived evils that *Miranda* was intended to address, it is critical to note not every "question" equates to "questioning" or "interrogation." Rather, the phone number question posed by Detective Lavis is best

characterized as the type of inquiry " 'normally attendant to arrest and custody' " and thus, was not interrogational. *South Dakota v Neville*, 459 US 553, 564 n 15; 103 S Ct 916; 74 L Ed 2d 748 (1983), quoting *Rhode Island v Innis*, 446 US 291, 301; 100 S Ct 1682; 64 L Ed 2d 297 (1980). The trial court did not err when it determined that the acquisition of defendant's phone number by Detective Lavis did not constitute a violation of *Miranda*.

Defendant also argues that while there are "routine booking questions" and "general on-the-scene questions" exceptions to the *Miranda* requirement, the aforementioned exceptions are not applicable in instances where the questioning officers should have known that their words or actions were reasonably likely to elicit an incriminating response, as in the instant case. However, the acquisition of a phone number fits squarely within the routine booking exception as enumerated by the United States Supreme Court, which "exempts from *Miranda*'s coverage questions to secure the biographical data necessary to complete booking or pretrial services," and that "appear reasonably related to the police's administrative concerns." *Pennsylvania v Muniz*, 496 US 582, 601-602; 110 S Ct 2638; 110 L Ed 2d 528 (1990) (quotation marks and citations omitted). Administrative questions may include inquiries about defendant's name, height, weight, eye color, date of birth, and current address. *Id*. Because the question regarding defendant's phone number appears reasonably related to law enforcement's administrative concerns, and the record does not indicate that defendant had a particular susceptibility to the questioning or that Detective Lavis used the booking questions to elicit an incriminating statement, the question falls outside the protections of *Miranda*.[3] *Id*.

Even assuming that defendant was entitled to be advised of his rights under *Miranda* prior to providing his phone number to Detective Lavis, "[p]hysical evidence obtained as a result of an unwarned statement remains admissible as long as the statement was voluntary." *Campbell*, 329 Mich App at 204. Our Supreme Court has observed that "application of the exclusionary rule to evidence obtained as a result of a *Miranda* violation is not a foregone conclusion because a violation of *Miranda* is not, in and of itself, a violation of the Constitution." *Id*. Consequently, "[i]t is only the physical fruits of an actually coerced statement that must be suppressed to serve the deterrent purpose of the exclusionary rule." *Id*. There is nothing in the record to suggest that defendant was forced or coerced to provide his phone number. Consequently, the derivative physical evidence, defendant's cell phone and the Offer Up business records which detailed a listing for the Pontiac Aztek under defendant's phone number, were appropriately admitted by the trial court. Because the exclusionary rule does not apply to physical evidence seized as a result of a voluntary statement, defendant's contention that the evidence should have been excluded from trial lacks legal merit unrelated to whether a violation of *Miranda* actually occurred.

## III. MOTION TO EXCLUDE FIREARM

Defendant argues that the trial court erred when it denied his motion to exclude the recovered firearm because he established that his due process rights were violated when law

---

[3] Defendant also argues that "biographical questions that are also asked for investigative reasons should be subject to the *Miranda* requirement." However, defendant admits that there is no Michigan case law in support of his argument.

enforcement destroyed potentially exculpatory evidence by handling the firearm without gloves before it was tested for fingerprints. We disagree.

As stated above, "[w]e review de novo a trial court's ultimate decision on a motion to suppress on the basis of an alleged constitutional violation." *Gingrich*, 307 Mich App at 661. "Although this Court engages in a de novo review of the entire record, it will not disturb a trial court's factual findings unless those findings are clearly erroneous." *Steele*, 292 Mich App at 313.

"To warrant reversal on a claimed due-process violation involving the failure to preserve evidence, a 'defendant must prove that the missing evidence was exculpatory or that law enforcement personnel acted in bad faith.' " *People v Dickinson*, 321 Mich App 1, 16; 909 NW2d 24 (2017), quoting *People v Hanks*, 276 Mich App 91, 95; 740 NW2d 530 (2007). "When the evidence is only 'potentially useful,' a failure to preserve the evidence does not amount to a due-process violation unless a defendant establishes bad faith." *Dickinson*, 321 Mich App at 16, citing *Arizona v Youngblood*, 488 US 51, 58; 109 S Ct 333; 102 L Ed 2d 281 (1988). "The defendant bears the burden of showing that the evidence was exculpatory or that the police acted in bad faith." *Jones*, 301 Mich App at 581. "A prosecutor is not required to seek and find exculpatory evidence or assist in building the defendant's case, and a prosecutor is not required to negate every theory consistent with defendant's innocence." *Dickinson*, 321 Mich App at 16 (quotation marks and citation omitted). "Absent a showing of suppression of evidence, intentional misconduct, or bad faith, the prosecutor and the police are not required to test evidence to accord a defendant due process." *People v Green*, 310 Mich App 249, 255; 871 NW2d 888 (2015).

Defendant first argues that Officer Timmis, who initially preserved the gun for fingerprinting, was aware that the MSP crime laboratory neglected to complete the requested fingerprinting at the time of trial, and proceeded to present the gun before the court without taking any precautions to ensure its integrity. Defendant further contends that Officer Timmis intentionally failed to inform the court of the aforementioned information, and the trial court deputy handled the firearm with her bare hands, thereby destroying the possibility of subsequent fingerprint testing. Defendant maintains that Officer Timmis's actions were enough to show bad faith. The record does not support defendant's argument.

This Court finds it necessary to lay out the specific facts surrounding the discovery of the lack of fingerprint testing of the exterior of the firearm in order to adequately address defendant's argument. On the first day of the bench trial, June 18, 2019, Officer Timmis testified that, while wearing gloves, he removed the firearm that he found in the Pontiac Aztek and preserved it for fingerprint testing. He also testified that he removed the bullets with gloves on to preserve them for testing as well. Officer Timmis then placed both the firearm and ammunition into evidence. Officer Timmis further testified that on February 4, 2019, the firearm and ammunition were submitted to the MSP for fingerprint testing. On direct examination, Officer Timmis was asked to remove the firearm from its evidence box and identify it. Prior to doing so, the court took a break for a court deputy to check the gun to ensure it was safe for handling. Officer Timmis then handled the firearm and identified it as the gun he recovered from the center console of the Pontiac Aztek.

On cross examination, Officer Timmis was asked whether any fingerprinting results were given to him regarding the firearm. Officer Timmis testified that he had not heard anything back from the MSP regarding the firearm. On the second day of trial, June 19, 2019, cross examination

of Officer Timmis continued, and he testified that it was beyond the scope of his job responsibilities to determine whether the requisite fingerprinting was completed on seized items, as that was left up to the detective in charge.

On the third day of trial, July 1, 2019, the parties jointly requested an adjournment to send the firearm back to the MSP for both fingerprinting and DNA analysis. The court expressed its concern that both the court deputy and Officer Timmis handled the firearm without gloves, but granted the adjournment. The bench trial continued on July 11, 2019, and the prosecutor informed the court that the MSP refused to test the exterior of the firearm for fingerprints because the integrity of the gun was compromised. The trial was again adjourned for the prosecution to have time to respond to defendant's motion to exclude the firearm.

In response to defendant's motion to exclude the firearm, the prosecution stated that it was not informed before trial that the MSP failed to complete the necessary fingerprinting tests on the firearm. However, the prosecution noted that the firearm was tested for DNA on May 31, 2019, prior to the beginning of trial, and that the subsequent report was completed on July 8, 2019.

On August 9, 2019, the trial court held a hearing on defendant's motion. The prosecution reported at the hearing that the DNA testing of the firearm returned inconclusive. The prosecution also shared that it was awaiting a second report regarding fingerprint testing of the gun magazine, which remained undisturbed.

On September 6, 2019, the parties reconvened for the continued bench trial. The prosecution reported that the fingerprint testing of the firearm magazine was processed with no latent fingerprints of comparative value. The trial court then heard additional argument regarding defendant's motion to exclude the firearm. In denying defendant's motion to exclude the firearm, the trial court stated:

> And, uhm, I do recall the testimony, uhm, of the Officer.
>
> I did not, uh, at least I understood it, that it, we were all learning about the gun not being tested, as it was going along.
>
> * * *
>
> Uhm, going, going beyond that, uh you—the defense, in order to show bad faith, defense has to actually prove that there was a conscious effort to suppress the exculpatory evidence.
>
> And one would have to accept that had, uh—well, we know D.N.A. was properly done, because it was done prior to it being touched in court.
>
> Uh, but in terms of the finger prints, itself, one would have to presume that there would have been exculpatory evidence, actually found, on the weapon.
>
> Uhm, I simply don't find that there was bad faith, in this.

I do find, uh, I do believe there was some possible negligence, in sending the weapon out for testing, and then not confirming that testing wasn't done.

Or not confirming that it couldn't be done.

One or the other, before bringing it to court.

But I don't think that rises to the level of suppression of the evidence.

And even if I find that that was negligent, uhm, we don't have—there's no reason to believe that that, that the finger prints would have been outcome determinative.

There's nothing to show that there would have actually been finger prints on there, uh, at all, and there would have been any type of evidence, uhm, that would have been helpful to myself, as the trier of fact.

Uh, I do think, ultimately, really, its [sic] cuts against the People, because we do have the defendant, in a vehicle, driving this vehicle that isn't registered to him, and the gun isn't in plain view.

And so, it certainly doesn't help the People's case, that finger prints were never—uh, that the gun was never properly tested for finger prints.

As the trial court correctly observed, the testimony of Officer Timmis did not indicate that he purposefully withheld prior knowledge of the matter. Rather, he testified that he had not heard back regarding a fingerprint analysis report of the firearm and that it was not his job duty to follow up. The parties contemporaneously learned of the MSP's failure to test the firearm for fingerprints during the bench trial. Moreover, while the gun was not tested for fingerprints, the firearm was tested for DNA prior to the beginning of trial, and the MSP tested the gun magazine for fingerprints following the contamination of the firearm's exterior. Therefore, the trial court did not clearly err in determining that defendant failed to prove that law enforcement acted in bad faith.

Defendant next argues that the trial court incorrectly concluded that the suppression of the firearm was unjustified due to a misreading of *Youngblood* because the court defined "bad faith" too strictly. Defendant contends that he is not required to demonstrate that the police intentionally deprived defendant of potentially useful evidence; rather, it is sufficient that an officer consciously failed to preserve the evidence, or its testability, as in the instant case. However, in previous caselaw addressing law enforcement's failure to test a weapon for fingerprints, this Court has recognized that there is a crucial distinction between failing to disclose evidence that has been developed and failing to develop evidence, for due process purposes. *Green*, 310 Mich App at 256. Furthermore, the trial court did not obligate defendant to establish that Officer Timmis, or any other officer, purposefully compromised the integrity of the gun for fingerprinting; rather, the

court determined that law enforcement's conduct was more appropriately characterized as negligence, as opposed to bad faith.[4]

Affirmed.

/s/ Christopher M. Murray
/s/ Colleen A. O'Brien
/s/ Brock A. Swartzle

---

[4] This Court finds it unnecessary to address defendant's final argument that the trial court erred by concluding that fingerprint testing of the firearm's exterior was not potentially useful. The trial court correctly concluded that law enforcement did not act in bad faith. Unless defendant could prove that an officer acted in bad faith, failure to preserve potentially useful evidence does not constitute a due process violation. *Dickinson*, 321 Mich App at 16.